## A. W. BALDOCK v. STATE.

No. A-2771.   Opinion Filed July 16, 1919.

(182 Pac. 265.)

1.   **EVIDENCE—Absent Witnesses—Transcript of Testimony on Preliminary Hearing — Admissibility.** Where a witness for the state, whom the defendant had an opportunity to cross-examine, is without the state, a transcribed copy of the stenographic notes of the testimony of such witness given on the preliminary examination of the defendant is admissible in evidence against the defendant upon his subsequent trial, notwithstanding such transcript of said testimony has not been filed in the trial court.

2.   **HOMICIDE—Manslaughter in Second Degree—Sufficiency of Evidence.** The record in this case carefully examined and considered, and the evidence found insufficient to support the verdict returned and the judgment thereon rendered.

*Appeal from District Court, Greer County;*
*T. P. Clay, Judge.*

A. W. Baldock was convicted of manslaughter in the second degree, and he appeals. Reversed and remanded, with instructions to discharge defendant.

*A. M. Stewart* and *Chas. L. Moore,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, A. W. Baldock, hereinafter called defendant, was informed against for the murder of E. T. Hurt, convicted of manslaughter in the second degree, and sentenced to serve six months' imprisonment in the county jail of Greer county at hard labor, and to pay a fine of $500.

To reverse the judgment rendered, he prosecutes this appeal.

The material undenied evidence is that Logan Pool worked in the Star cafe at Mangum, Okla., as a cook, and that on the 8th day of June, 1915, after supper, the defendant went to said restaurant and asked for Logan Pool, who at the time was in the kitchen of said restaurant; that a message was sent and said Pool came into the dining room where the defendant was, and at the time had on an apron but no coat, and was apparently quiet and cool; that the defendant and Pool then went out in front of the restaurant and talked some 15 or 20 minutes and returned to the dining room, at which time Pool appeared

to be pale, like he was mad and nervous, went back into
the kitchen, pulled off his apron, put on his coat and hat,
and rejoined the defendant, and they together left the
restaurant, and Pool went to near the front of the Owl
drug store; and that, after Pool reached said point, E. T.
Hurt, the deceased, passed and went into the said drug
store, from which he was shortly thereafter called, and
went out where Pool was, and almost immediately there-
after said Hurt was shot by said Pool, and Hurt returned
to the drug store and announced that Pool had shot him,
and in a short time Hurt was removed to Dr. Border's
hospital, where, on the 12th day of June, 1915, he, from
effect of the gunshot wound inflicted upon him by Pool,
died; that Pool was convicted of manslaughter in the first
degree for killing Hurt.

The evidence is in conflict as to the whereabouts of
the defendant at the time Pool shot the deceased, there
being evidence that just before the shooting, when the de-
ceased passed Pool going into the Owl drug store, the de-
fendant was near Pool, and pointed out the deceased as
the one having on light clothes, while, on the other hand,
there is evidence that the defendant had left Pool prior to
the shooting, going in the direction of his home, and there
was also evidence that immediately after the shot he was
seen running from the scene of the shooting, and that he
—with many others, attracted by the shot—was at the said
drug store before the deceased was removed therefrom to
the hospital.

A transcript of the evidence of the wife of Pool, who
was examined as a witness for the state on the preliminary
examination of Pool for the killing of Hurt, which evidence
was taken down by the court stenographer, but said tran-
script was not filed in the office of the court clerk of the

county, was admitted in evidence, and to the introduction of said transcript, for which a predicate therefor had been laid by showing that a subpoena had been served upon said witness to attend this trial, and that she was in Texas and unable to attend the trial by reason of her expected early confinement, the defendant objected and excepted.

As shown by said transcript, the said witness testified at said preliminary examination that she was the wife of the said Pool, and that prior to and since her marriage she had worked as a barber in defendant's barber shop in Mangum, and he had told her that he loved her better than any woman in the world; that the deceased was regularly shaved by her and often lingered long in her chair after she had shaved him, and gave her frequent tips, all of which was known to the defendant; that prior to her marriage she lived in the home of the defendant as one of the family; that prior to and since her marriage she and the defendant frequently had sexual intercourse in the barber shop; and that the last time she had had sexual intercourse with him was on Friday, two weeks before the preliminary trial of her husband; and that since her marriage she had had frequent sexual intercourse with Hurt, the deceased.

The state introduced said Logan Pool as a witness, who testified that he was a convict in the penitentiary at McAlester; that his wife worked for the defendant in his barber shop prior to his marriage to her; that on the 8th day of June the defendant came to where he was employed and asked for him, and that he went out of the kitchen in response thereto and met the defendant in the restaurant, and he and defendant then went out in front of the restaurant, and the defendant began telling him about his (witness') home being broken up by Hurt, saying that if he

was in the place of witness he would take a gun or club
and catch them together and knock his head off; told wit-
ness of different occasions, when Hurt would come down to
the shop to have work done, that he would lie in the chair
as much as an hour after his work was completed, and
some times his (witness') wife would have to leave the shop
and go out to try to get him to leave the chair; that Hurt
would follow her out and meet her at the Owl drug store
on different occasions; and that one of Hurt's next door
neighbors said if witness would kill Hurt he would be paid
for it; that he told the defendant to wait there, and he
would go into the restaurant, and then go down the street
with him; that he went in, took off his apron, got his coat
and hat and the pistol, and went out of the restaurant
with the defendant; and that they went on together to B.
E. Davis' store; that he (witness) went in the store and
inquired for Hurt, and was informed by the party inquired
of that he did not know where Hurt was; that, while he
was in Davis' store, the defendant remained in front of the
store, and witness rejoined him there, and they continued
on to near the post office, where they were passed by three
persons, one of whom the defendant informed witness—
the one in a light suit—was Hurt; that Hurt and those
with him went into the Owl drug store; that witness
called Hurt out, and when Hurt came witness began speak-
ing to him, to which Hurt did not reply, but pulled his
gun and snapped it in his face; that he then shot Hurt;
that after he fired was the last time he saw the defendant;
that he and defendant on said night did not reach any
agreement, or consent, by which he was to kill Hurt; that
the defendant did not assist him in getting a gun; that he
did not believe that the defendant knew that he had a gun;

that he did not say anything to the defendant about having a gun; that what the defendant told him made him so mad that he went and got the gun; that they had no agreement to go to any particular place, or to hunt Hurt; that they were talking out in the public street in an ordinary tone of voice where people were passing all the time; that any passers-by could have heard what they said; that they left the restaurant together, and went together; that the defendant was going in the direction of his home; that the defendant did not know for what purpose he went into Davis'; that he was looking for Hurt, but that he did not communicate this to the defendant; that he did not have any understanding that he was to have any consideration for testifying against the defendant; that the defendant, prior to the time he talked to him in front of the restaurant, had talked to him about his domestic troubles; that, prior to having the talk with the deefndant in front of the restaurant, he had not threatened to kill Hurt; that he told the defendant, when talking with him that night, that he thought that Hurt had such a hold on his wife that he could not do anything with her; that the relations of witness and defendant were friendly until he found out that the defendant had tried to keep his wife from marrying him; that the night he talked to the defendant in front of the restaurant his relations to the defendant were not very friendly; that he made no arrangement with the defendant to murder Hurt; that he and his wife separated on the day preceding the killing of Hurt; that the separation of the witness and his wife was not due to anything done or said by the defendant, but was caused by the phone talk that he overheard between Hurt and witness' wife; that he did not remember whether or not the defendant said to him, when talking in front of the restaurant, "Now is

your time"; that the defendant had nothing to do with the killing of Hurt; that he killed Hurt in self-defense.

Mrs. Douglass testified that the night Hurt was killed she passed very close to the defendant when he and Pool were talking in front of the Star cafe, and that she heard the defendant say to Pool, "Now is your time," and Pool replied, "All right, you go down the street and walk slow, and I will catch you."

Will Latimere testified that the night Hurt was shot he, after dark, passed the Star cafe, and that the defendant and Pool were in conversation in front of said cafe, and he heard the defendant say, "She says she has plenty of money."

Several witnesses testified that they were customers of defendant's shop, and had seen the defendant and the wife of Pool together in said shop and had never seen' anything improper between them, and another witness testified that he was a customer of said shop and had seen the defendant, in his shop, "punch Pool's wife in the ribs."

The defendant testified: That he had always maintained friendly relations with Pool and his wife, and that Mrs. Pool prior to her marriage lived in his home and worked in his shop as a barber, and that he treated her just like he would a daughter. That she showed him a letter from Pool proposing marriage. That he spoke well of Pool and advised her to accept his proposal of marriage. That he and his wife went with her to the depot when she went to Elk City to be married to Pool. That when she worked in his shop her conduct was good. That he never saw anything unusual with her and Hurt. That she often got tips from Hurt and others and always told him about it. That, after her marriage and return to Mangum, Pool

and wife lived the first door north of where defendant
lived. That at the time of the killing Pool and wife lived
in the northeast part of Mangum. That he had heard of
the domestic troubles of Pool and his wife. That he was
informed of it preceding the killing of Hurt on Tuesday,
and was so informed by Pool's wife, who came to his shop
for that purpose, and after she had related to him the par-
ticulars of their troubles he told her he would speak to
Pool the first time he saw him, and tell him that he had
never in his shop or in his home seen a thing wrong. That
on the night of the killing of Hurt he came from his home
uptown to get some tobacco, and concluded to buy some
fresh meat for breakfast, and went to a butcher shop which
is a few doors north of the Star cafe. That the shop was
closed, and he then went in front of said cafe and looked
in the window to see if Pool was there, then went into the
restaurant, and in obedience to defendant's request Pool
came out of the kitchen in his shirt sleeves with an apron
on, and they went out in front of the cafe, where it was
well lighted and where many people were passing; and that
he told Pool that he did not want him to think that he was
meddling in his family affairs, but that Cleo (Pool's wife)
told him that he (Pool) had threatened to kill her over
some remarks he had heard about her character; that he
did not think these remarks true; that he had never heard
of anything wrong; that she could not have stayed in his
home if she had not been what she ought to have been, an
upright girl; that "whoever told you that your wife was a
sport before she married you ought to have his head
knocked off with a club"; that she made an honest living
while she worked for him and made plenty of money, and
never did anything to cause him to be suspicious of her;
that he believed she was true. That Pool replied, "Burt,

you do not know it all," and was almost in tears; that he (Pool) had overheard a phone conversation of her with Hurt; that Hurt was renting a house for her and "is going to move her tomorrow, and making arrangements to take her to Wichita"; that he (Pool) had tried to quiet her and could not do it; that "you (defendant) and your wife" and he could not do any more; and defendant replied he thought "we could settle it without any trouble," and when they got through talking defendant said:

"Now, Pool, you can rely on us, I and my wife, being your friends. We always favored Cleo before you knew her. We will do anything to help settle your trouble. We certainly are your friends, and if you ever needed friends now is the time."

And that defendant started to walk down the street. That Pool started into the restaurant, turned around, and said "Wait a minute," he was going down that way, and defendant stepped into the restaurant and waited for Pool, who got his coat and hat and rejoined defendant, and they left the restaurant and went down the street together. That he had no agreement with Pool about killing Hurt. That he did not know anything about it. That he did not know of Pool's having a gun. That he (defendant) did not have, and had never owned, a gun. That in said conversation nothing was said about a gun. That nothing was said about trying to find Hurt. That there was no understanding between them about where they were going. That he (defendant) was going home his usual way. That Pool said he was going to the Palace theater. That defendant stopped in front of Irving's to get the Western Union time, and when he did so Pool was walking right ahead of him. That he never paid any more attention to him. That the next time he saw Pool was when he got in front of

Mangum drug store. That defendant went into Davis' to get some tobacco, and after he got the tobacco he came out on the square, and Pool came up right against him, and, after they had reached near the corner of the courthouse square, Pool left him, saying, "There goes Hurt, I am going to speak to him," and defendant said, "You had better come on and go home." That he was on Lincoln street at some distance from Pool when the pistol fired. That Pool had left him. That, after the pistol fired, he went back to the drug store, and from the drug store to Davis' store. That he stood a while after the pistol fired and watched Pool and saw him when he broke and ran across the street. That he first discovered that Hurt was shot when he got to the drug store. That it struck him that Pool was going straight home to carry out his threat to kill his wife, and that he wanted to notify her, was the reason that he went to Davis' store, and when he ran into the store Pool's wife's father was standing in the door, and he told him he had better phone to his daughter to leave the house; that Pool had shot Hurt and was "on the road up there." That Pool's father-in-law would not have anything to do with it, and that he asked Thad Tucker to phone, but it could not be done because they did not know the phone number and it was not on the calendar. That he stayed at the store about 15 or 20 minutes, and went back to the drug store and stopped there about a minute, and then went home. That Hurt's name was not mentioned from the time they left the Star cafe to where Pool left him. That there was no understanding between him and Pool to, and that he did not assist in any way to, find Hurt or to kill him. That he told Pool he thought the best thing for Mrs. Pool to do was to quit working at his shop; that it would keep her from coming in contact with those people he was jealous of.

That he had no intention at any time to cause the death of Hurt or to do him any harm. That the night Hurt was killed he did not act in the furtherance of his death. That he did not know that he was going to be killed. That he had no ill feeling towards Hurt. That Hurt was one of his best friends and customers.

The defendant separately objected and excepted to every paragraph of the instructions given to the jury, and requested several instructions which were refused, and their refusal separately excepted to, which said instructions given, and instructions refused, we deem unnecessary to recite.

The defendant filed a motion for a new trial upon the ground, among other grounds, "That the verdict is contrary to the evidence and is not sustained by the evidence."

The material question presented for review is: Does the evidence sufficiently support the verdict rendered?

The state having introduced Pool as a witness, it thereby vouched for his veracity, and relies almost entirely upon his evidence for a conviction; but he does not testify that in the conversation had with the defendant in front of the Star cafe on the night of, and before, the killing of Hurt, or at any other time, the defendant advised, counseled, procured, or encouraged, or in any way aided or abetted, Pool to kill Hurt, nor can it reasonably be inferred from the entire evidence of Pool that the defendant was an accomplice of Pool in said killing. While, on the contrary, Pool testified that the defendant did not know that he (Pool) on the night of the killing had a pistol, until after the shot was fired by Pool that resulted in the death of Hurt, and that the defendant "did not have anything what-

ever to do with the killing of Hurt, and that he (Pool) killed Hurt in self-defense."

In order to legally convict one as an accomplice—a principal under our statutes (Rev. Laws 1910, sec. 2104)— it must be shown beyond a reasonable doubt that the one so accused advised, counseled, procured, or encouraged, or in some way aided and abetted, another to commit the crime charged. In the instant case it was essential to a proper conviction of the defendant that the state prove beyond a reasonable doubt that he advised, counseled, procured, encouraged, or in some way aided or abetted the defendant in killing Hurt. *Hendrix v. State,* 8 Okla. Cr. 530, 129 Pac. 78, 43 L. R. A. (N. S.) 546.

"An 'accomplice' is one who is not present at the commission of the offense, but who, before the act is done, advises, commands or encourages another to commit an offense; or who, being present, aids by acts, or encourages by words, the principal offender in the commission of the offense." *Smith v. State,* 13 Tex. App. 507, 511.

Webster defines an "accomplice" as follows:

"A co-operator or as an associate in general, an associate in crime, a participator or partner in guilt."

The evidence that a lady, who passed near the defendant when he and Pool were talking in front of the Star cafe on the night and before Hurt was killed, heard the defendant say to Pool, "Now is your time," but did not hear the other part of said conversation, or know in what connection "now is your time" was used, we think reasonably explained by the evidence of the defendant as not being used in a criminal sense by the defendant, the defendant testifying, and not impeached, that he said to Pool at the time and place named, "If you ever needed a friend, now is your time," and therefore little, if any, incriminat-

ing weight can be given to what she heard the defendant say—"Now is you time"—even if she heard exactly what the defendant said.

As to the eivdence of the wife of Pool, shown by a transcript of her evidence taken at the preliminary examination of Pool for killing Hurt, which transcript had not been filed in the trial court, and the admission of which as evidence was objected to by the defendant, we think upon proof by the state that Mrs. Pool had been summoned in the case, and that she was in the state of Texas and unable to attend the trial by reason of expecting to be confined at an early day, that the said transcript was properly admitted. Said evidence shows that she smiled upon both the defendant and Hurt, and that each, Hurt and the defendant, reveled in her adulterous embraces, and that at the time of the killing of Hurt he seemed to have been more favored by her than was the defendant; and it is insisted by the state that this situation furnished a motive on the part of the defendant to have Hurt effectually put out of the way, and that this motive, together with other evidence in the case, is sufficient to sustain the conviction of the defendant. With this contention we cannot agree, as we are unable to see that the evidence warranted the conviction of the defendant of any offense; certainly it did not of manslaughter in the second degree, an offense not supported by any evidence in the case, and did not authorize the instruction given by the court that the defendant might be found guilty "of mansaughter in the second degree."

If all the evidence in the case be eliminated, except the evidence for the state, we think such evidence insufficient to support the verdict rendered in this case, or to establish the guilt of the defendant of any offense, and that

the court committed fundamental error in overruling the motion for a new trial; and when the entire evidence is considered—which should be done when acting upon a motion for a new trial—and it is remembered that the veracity of the defendant is not questioned by the state, said error of the trial court is emphasized.

"So, where the issue is one of fact only, and the court on review of the whole evidence is not satisfied that the facts proved justify the verdict found, a new trial should be granted." 12 Cyc. page 732, and authorities cited in note 15.

"While it is well settled that this court will not disturb the verdict on account of the evidence when there is evidence to support it, the converse rule is equally well settled, that it is not only a province, but the duty, of the court to set aside such a verdict when it is contrary to the evidence, or where there is no evidence to support it." *Benson v. State,* 10 Okla. Cr. 16, 133 Pac. 271.

As the error pointed out must work a reversal of the judgment rendered, we deem it unnecessary to review any of the other errors assigned.

The judgment of conviction is reversed, and the case remanded, and, as the conviction of the defendant of any offense cannot be legally had under the evidence in the case, the trial court is hereby directed to enter an order discharging the defendant in said case.

DOYLE, P. J., and MATSON, J., concur.