GEORGE MORRISON et al. v. STATE.

No. A-9022.   May 8, 1936.
(57 Pac. [2d] 882.)

Welch & Cunningham, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiffs in error were by information jointly charged with murder; jointly tried, convicted of manslaughter in the first degree, and plaintiff in error George Morrison was sentenced to confinement in the state penitentiary for a term of 25 years; and defendant Felix Morrison was sentenced to confinement in the state penitentiary for a term of five years. From the judgment both plaintiffs in error, who will hereinafter be referred to as the defendants, appeal.

In summing up the testimony against the defendants, we will first present an abstract of the testimony introduced by the state and the defendants, as to the defendant Felix Morrison, as the record shows the defendant George Morrison is the one who fired the shot that took the life of the deceased, Sim Cook. At the time of the killing, the deceased was the town marshal of Woodville, and the defendant George Morrison was a constable.

Charley Strickland, testifying for the state, stated he was at a basket ball game at the school house the night of the killing; he saw the defendant George Morrison standing in front of the door of the school building, and deceased was there also; that both the deceased and George Morrison went away from the front of the building, and the shooting took place a little south of the little building, or just across the sidewalk; "immediately after the shot was fired I heard Felix Morrison say, 'Give him another one.' I do not know who he was addressing." Felix was about 35 feet down the sidewalk from George Morrison, the defendant, and Sim Cook, the deceased, at the time the shot was fired; "I do not know what Felix Morrison did after the shot was fired."

J. W. Johnson, testifying for the state, stated:

"Just before the shot was fired I heard the deceased, Cook, tell Felix to stand back; at that time Felix was about ten feet down the road from George and deceased; I was about 18 feet away from all of them, hiding behind a bannister."

Mrs. Jessie Taylor states she was very close to the scene at the time of the difficulty; she did not hear or mention seeing Felix or hearing the deceased or any one else say anything except George Morrison, the defendant.

George French stated:

"I was at the school house at the basket ball game the night the homicide occurred. After the shot I went up near where the body of the deceased was, and saw Felix Morrison there with the bunch, but did not hear Felix say anything or see him do anything."

W. I. Lemons stated:

"I heard the shot and came up to the school house and saw Felix Morrison standing on the sidewalk in the crowd."

The testimony of a witness by the name of Reed, taken at the preliminary trial, was read to the jury, in which testimony it was stated he saw Felix going in the direction George and the deceased had gone, and he heard the deceased tell Felix to stand back; the deceased and defendant walked away before Felix went toward where they were. "At the time Felix was walking toward them nothing unusual attracted my attention."

J. H. Dillon, a witness for the state, stated:

"After the shooting Felix Morrison, or some one, was standing right by me; he said pour it on him, he may not be dead."

Carl Spence stated:

"I was about four blocks away when I heard the shot; when he came up to the crowd Felix was standing there, and stated he would not get any more halves; I do not know what Felix was referring to."

The defendant George Morrison, testifying with reference to his brother Felix, stated that:

"After the deceased Cook had accosted him and the difficulty started, Cook said to Felix, 'Stand back, Felix, or I will kill you, too.' "

Felix Morrison, testifying in his own behalf, denied making the statement, "Give him another, he may not

be dead," and that he would not get any more halves. Felix stated he did not have a gun the night of the trouble; that he was out looking for one of his boys when the trouble came up.

Joe B. Goff testified for the defense that just before George Morrison fell he was standing still:

"It was very dark excepting Sim Cook's flashlight; after George fell I said to Felix, 'Are you going to let him do that to your brother?' and he said, 'Nothing I can do.' Immediately a shot fired; Sim Cook was standing when George shot him; had a flashlight in his hand; I did not see George pull his gun; I did not hear Felix say to shoot again; Felix Morrison was standing near me when I saw him; I did not hear him tell his brother to give him another, he might not be dead yet."

Ross McCarson, who was nearby, did not recall seeing Felix or hearing him say anything. The testimony shows that it was very dark and the deceased and the defendant were out some distance from the crowd; some time during the difficulty the deceased had a flashlight.

The foregoing is in substance the testimony of both the state and the defendants as to the presence of Felix Morrison at the difficulty, and the remarks made by him prior to the shooting as to what some of the witnesses claim to have heard the deceased tell Felix Morrison to stand back. The proof shows he was several feet from the deceased and the defendant at the time.

Charley Strickland, a witness for the state, stated:

"I attended the basket ball game at the school house in Woodville the night of the difficulty; I saw George Morrison before the shooting, and I also saw the deceased standing up in front of the door of the school house; George Morrison and the deceased left and went a little south of the building across the sidewalk, a distance of

about 30 feet; I was about 15 feet from defendant and the deceased at the time the shooting took place; I heard Cook tell George not to get his gun; Sim Cook fell at the time he was shot; before the shooting I heard a lick, or what I took to be a lick; I do not know whether the deceased had a gun or not."

J. W. Johnson testified on behalf of the state:

"I was at the school house the night of the shooting; Sim Cook and George Morrison passed me going out of the school house to the street; Cook was the town marshal and George Morrison was constable; they went south from the school house; I heard the shot, I was in the school house behind a bannister; I did not see any portion of the difficulty; I saw a flashlight on the street where the parties were."

John Ayres, a witness for the state, stated:

"I attended the basket ball game at Woodville the night of the trouble; I saw George Morrison, and the deceased, Sim Cook."

Mrs. Jessie Taylor testified:

"I live at Woodville; I knew George Morrison and his brother Felix; in November, 1930, I was at the basket ball game at the school house; at the time of the trouble I was sitting in my car directly opposite the front door of the school house, which building faces west; I heard some scuffling across there behind the cars, and thought it was boys at the start; I heard Sim Cook say, 'What you doing with that gun?' and immediately thereafter the gun fired; I could not see the parties at the time I heard the scuffle; there was a string of cars between me and them; there was silence for some little time after the gun fired, then different parties came up to the place where I heard the scuffle seemingly to see if something had happened; I did not get out of my car. I came in contact with Mr. Cook in church work; I knew the sound of his voice; I think it was his voice I heard."

On cross-examination the witness stated her car was on the west side of the street:

"I did not see the flash of the gun to tell which way it was pointed; I was not scared and did not pay much attention, I don't remember which way I looked; I am positive I heard Sim Cook make some remark about a gun."

George French, a witness for the state, stated:

"I was acquainted with the defendants George and Felix Morrison; I was at the Woodville school house attending the basket ball game; I saw Felix one time after the trouble was all over; Sim Cook had been shot before I saw his body, which was lying on the ground out a little bit from the school house; I heard a shot, but do not know anything about who fired the shot."

On cross-examination witness stated the shot was fired from the ground:

"I turned about the time the shot was fired looking in the direction of where the parties were."

W. I. Lemons, testifying for the state, stated:

"I was at the basket ball game at the school house in Woodville the night of November 21, 1930; as I was returning from the school house to my home George Morrison overtook me; I heard a gun fire, or a car backfire— I did not know which it was at first—I thought it was a gun; a minute or two after I heard the shot George Morrison overtook me; he had something in his hand in his coat holding it; I could not tell what it was, it looked like a fruit jar; as he passed me I smelled the odor of whisky; I went back up to the school house and found the deceased dead; I smelled whisky when I got to the body of the deceased. Felix Morrison was on the sidewalk when I got up there, ten or fifteen feet, or a little further from the body; there were other parties there also; I am a constable at Woodville at this time."

On cross-examination witness stated that:

"In 1928, George Morrison and I made the race for constable and George beat me; in the summer of 1930, we again made the race and I beat George; George Morrison was serving his last days as constable; the deceased passed my house that evening going toward the schoolhouse; I had not been to the schoolhouse and did not see him before the shooting; I did not see George Morrison at the schoolhouse; I could not say when I put my gun on, but it was before the trouble; when I returned home the second time I did not take my pistol off; when I went up to where Sim Cook's body was, his pistol was on the ground; I asked Mr. Lacy Dillow to pick it up and take care of it; I knew it was Sim Cook's gun, as I had seen it many times; his gun was near his feet; I am a member of the city council, and Sim Cook was the constable."

Lacy Dillow stated:

"I live at Woodville; I am acquainted with W. F. Reed; the best I can learn W. F. Reed is in Texas; he has been gone from Woodville about three years. I knew Dee McCuen, have known him all his life; he is working for the Prairie in Oklahoma somewhere, maybe one day in Oklahoma City and from there to the Kansas line; I am a justice of the peace."

On cross-examination witness stated:

"I made no effort to locate Dee McCuen; I made inquiry from his folks; he has been gone since February, working for the Prairie Company; I made no effort to learn from the pipe line company McCuen's whereabouts; he is supposed to be between Oklahoma City and the Kansas line."

T. Z. Splawn, called as a witness for the state, stated:

"I am the sheriff of Marshall county, Oklahoma; I received a subpoena for W. F. Reed; I tried to find him but I did not serve it; some said he was dead, and some said he had left the neighborhood; I received a subpoena

for Dee McCuen; his folks said he left three or four months ago, that he was in Oklahoma or Kansas, they did not knew which place."

On cross-examination witness stated he had known the case was set for about two weeks; McCuen's father and mother lived at Woodville:

"His brother told me he was supposed to be in Oklahoma or Kansas, they did not know, working for some oil company; McCuen was 18 years of age; I reported he was gone; that was my information; I did not ask his mother or father about him; I did not make any return on the subpoena."

The record shows that Dillow and Splawn were called for the purpose of laying a predicate for the state so as to be able to use the testimony of the two witnesses taken in the preliminary trial. In addition to the two witnesses, the court clerk was called to show he issued subpoenas for the witnesses and Sam Y. Colby, testified as to being in the neighborhood of Woodville; that he did not see the mother of Dee McCuen, but asked some parties that lived in the house where the mother lived. Over the objections of the defendants, the court permitted the testimony of W. F. Reed, taken in the preliminary trial, to be read as part of the testimony in the trial of this case.

W. F. Reed stated in his testimony:

"I saw Mr. Cook and George Morrison go off together; I saw Felix go in the direction they went, and I followed as far as the sidewalk; I could not see a thing in the world; I heard Mr. Cook tell Felix to stand back, not to come up; I did not hear any statement made by anyone relative to what are you going to do with that gun."

J. H. Dillon, testifying for the state, stated:

"I was at the schoolhouse the night of the difficulty; I saw Sim Cook and George Morrison in front of the

schoolhouse; George Morrison was talking and Sim Cook said something to him, to cut it out; I did not understand anything Morrison said. Cook and Morrison went west across the road in front of the school house, and George fell over something; he went down for some cause, I think he stepped on a piece of pipe; I think it was a pipe that threw him down, but anyway he went down; I can't remember any conversation; Morrison shot before he got up; he shot immediately after he fell; Felix Morrison, or some one standing by me said, 'Pour it on him, he may not be dead'; Felix was standing across a ditch, probably eight or ten feet, at the time, I would not know positively about the distance. After Cook fell George picked something off the ground; it looked like a fruit jar, or drug store bottle, something about that size. I did not hear any statement made by George or Felix prior to the shooting."

Several other witnesses testifying for the state stated they were at the schoolhouse the night of the basket ball game, and saw the deceased and the defendants, George and Felix Morrison; that the defendant George Morrison and Sim Cook, the deceased, went off together out in the dark behind some cars; they heard a noise like some one had been struck, and they saw George Morrison fall or go down; the deceased had a flashlight and a pistol.

George Morrison fired a shot while on the ground that killed Sim Cook. Neither of the state's witnesses saw the defendant Felix Morrison do anything prior to the shooting; some of them claim they heard Sim Cook say, "Stand back, Felix." Other witnesses who were nearby did not hear him say anything. After the shooting, some of the witnesses claim they heard Felix say, "Pour it on him," or "Give him another, he may not be dead," and that he would not take any more halves. They did not know to whom he was talking. One of the other witnesses, testifying for the defendant, stated:

"When George was either knocked down or fell down, he asked his brother if he was going to let Cook do that, and Felix replied, 'What can I do?' and made no effort to advance toward where the deceased and the defendant George Morrison were."

The defendant George Morrison, testifying in his own behalf, stated:

"At the time of the difficulty I was living at Woodville; I am now living at Cumberland; I was constable, and the deceased was town marshal at the time of the trouble; I had beaten Mr. Lemons in the election two years previous, and in November prior to the difficulty Mr. Lemons had defeated me for constable. J. W. Johnson was also town officer at the time of the difficulty."

Defendant stated:

"I did not sell any whisky to Dee McCuen. I had some trouble with Sim Cook over the division of fees in a case; I went to the school house and put my little boy in the schoolhouse, and I stopped outside leaning against a pillar, talking and finishing a cigarette I was smoking; Sim Cook and Bill Johnson came to me, and stopped there a moment and then Sim said, 'Come here'; I thought maybe he had something and he wanted me to help him; I went on ahead and southwest of the building behind the cars he stopped and said, 'When are you going to pay me that sanitary bill?' and I said, 'I told you when I would pay it,' and I could see he was getting mad, he commenced shaking, and his voice was shaking, and I said, 'I walked away from you two or three times to keep from having trouble,' and then I said to him, 'I will borrow the money and pay you,' and he said, 'You are going to pay me right now,' and I said, 'Just a minute—give me a few days to borrow it and I will pay it'—and I said, 'You or the city beat me out of four or five dollars; I will borrow the money and pay you.' The deceased replied, 'You are too dog gone smart, you are messing with my business,' and I said, 'If I knew what your business was I would quit rather than have any trouble with you.' He

had his gun and rubbed me in the stomach, and grabbed me by the bib overalls with his left hand. Felix came up and the deceased said, 'Stand back, Felix, stand back'; he said, 'Don't move, I am going to kill you,' and I said, 'Don't do that.' I grabbed my gun and shot. I had it on the inside of my overalls in a scabbard; I pulled my gun and kept him from killing me."

Testimony was introduced to show that after the killing George Morrison got in communication with the sheriff's office and asked them to send some one out so he could surrender.

Tom Gresham, testifying for the defendant, said that:

"Shortly before the night of the difficulty I heard Sim Cook say he had his bluff in on George now, referring to George Morrison; it seems to me I told George about it but I am not positive I did."

Pete Whitely, testifying for the defendant, stated he knew the parties, and shortly before the killing he was in conversation with Sim Cook, in Woodville:

"George Morrison went across to the bank and Cook said, 'There goes a s—of—b— I am going to kill'; I said, 'What are you going to do that for?' and he said, 'He is so smart,' and I said, 'You ought not to talk that way.'"

Joe G. Goff, called by defendants, stated:

"I was at the basket ball game the night of the trouble; I saw Sim Cook call George Morrison off from the front door of the building; Cook said, 'Come here a minute'; if Cook said anything to George about talking too loud I did not hear him, and I think I would have heard it if he had said anything."

Ross McCarson stated he was at the basket ball game the night of the trouble at the schoolhouse; his attention was called to a flashlight around behind the cars southwest of the school building:

"I started out there with Charley Strickland, and he went on, I took my time; I heard some kind of a thud sound; I was about 30 feet from the parties; just as I got near them I saw the fire of the gun and Sim Cook fell; I did not hear anything said; as he fell I started back and saw George getting up; it looked like Cook fell on George and he rolled him off, and I went on and struck a match and Cook was lying there. George went on off."

Testimony was offered showing there was a bruise on the head of George Morrison, and the state asked some witnesses for the defendant if they had been convicted for a crime, and one or more of them admitted they had. Felix Morrison denied making the statements attributed to him, and denied taking any part in the difficulty; he admitted he was in the yard at the time of the shooting, and he saw George on the ground about the time the shot was fired.

The foregoing is the substance of the testimony, both for the state and the defendants.

The defendants have presented seven errors upon which they rely for a reversal. The first error discussed is that the verdict is contrary to the evidence, and against the weight of the evidence, and is insufficient as a matter of law to sustain the conviction. This assignment of error is discussed separately by counsel for the defendant Felix Morrison, and it is earnestly insisted by the defendant that the only evidence there was against him was the fact that he was present with many other parties at a public gathering at the schoolhouse where the homicide occurred. As shown by the record in this case, the deceased and George Morrison met in front of the school building, and went off together out in the dark behind some cars. The defendant Felix Morrison was not with George, nor was he present when the deceased and George

Morrison went out in the street, or away from the school building.

There is no evidence in the record tending to show that Felix and George Morrison had communicated with each other, or that they had conspired together to do the deceased any harm. There was a number of parties at the schoolhouse and around in the school yard when the deceased and the defendant went out in the dark; what took place between them no one seems to know; some of the witnesses say they heard the deceased say to Felix Morrison, 'Stand back"; other parties say they heard a thud like some one had been struck; the next thing they saw was the defendant George Morrison on the ground with the deceased standing over him, bending over a little bit, and the defendant George Morrison fired the shot that killed the deceased, Sim Cook, while he was on the ground.

One of the witnesses testifying stated that he asked Felix Morrison, who was standing near him when the deceased knocked his brother down, if he was going to let Sim Cook treat his brother that way, and Felix said, "What can I do," and took no part in the fight. Not a word except as stated herein was uttered by Felix Morrison, and no act of his indicated he had conspired with his brother or was aiding or abetting in the difficulty. The only remark any one claims to have heard was the remark from the deceased, saying, "stand back."

It is contended by the state that after the shot was fired and Cook was dead that the defendant Felix Morrison stated, "Give him another, he may not be dead." Several witnesses standing by say they did not hear that statement. He denies he made it. They claim he made another statement that he would not get any more halves

off of anyone. The statement was not addressed to any particular person, and they did not know about whom he was speaking as no names were called.

This is a review of every word of the testimony that in any way whatever shows the presence of the defendant Felix Morrison at the schoolhouse, or near where the difficulty took place.

It is not contended by the state that the defendant Felix Morrison took any part in the difficulty, or by any act or deed aided or encouraged his brother to commit the act, but, on the contrary, he kept away from them, and stated to one of the witnesses who asked him about the way the deceased was treating his brother, "What can I do about it?"

One witness testified he thought George stepped on a piece of pipe and it rolled and he fell, but there was a small bruise on his head and defendant stated he was struck with a pistol and fell.

In Moore et al. v. State, 4 Okla. Cr. 212, 111 Pac. 822, 824, this court in discussing the question stated:

"To constitute one a party to a crime under this statute, it is necessary that such person be concerned in the commission of the offense—that is, that he either commit it or aid or abet its commission—and it is not sufficient that he merely acquiesce therein. Consenting and acquiescing are mere mental acts, which, unless communicated to the perpetrator of the offense, in no manner aid or abet him in its perpetration. To be concerned in the commission of crime, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise, or encourage its commission. But a mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of en-

couragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime."

This question has been before this court many times since Moore et al. v. State, supra, was decided, and the court has followed the ruling laid down in the Moore Case. Polk v. State, 26 Okla. Cr. 283, 224 Pac. 194.

In Baldock v. State, 16 Okla. Cr. 203, 182 Pac. 265, this court in the body of the opinion stated, in substance, the following facts as presented by the state against the defendant: The defendant, talking to Logan Pool, said, "You can rely on us, I and my wife, being your friends; we always favored Cleo before you knew her; we will do anyhing to help you settle your trouble; we certainly are your friends; if you ever needed friends now is the time." The defendant Baldock started to walk away and Pool started into the restaurant, turned around and said, "Wait a minute," and he then stepped into the restaurant, got his coat and hat, and rejoined the defendant; that he had no agreement with Pool to kill Hurt; he did not know of Pool having a gun. The defendant did not have a gun, and had never owned a gun. In the conversation nothing was said about a gun; Pool said he was going to the Palace Theatre, and the defendant stopped in front of the Western Union to get the time; as they reached the corner of the court square Pool left him saying, "There goes Hurt, I am going to speak to him," and the defendant said, "Come on and go home"; he was on Lincoln street some distance from Pool when the pistol fired. After the pistol fired, the defendant went back to the drug store and from the drug store to Davis' store. There was no understanding between him and Pool to assist him to find Hurt, or to kill him; he told Pool the best thing for Mrs. Pool to do was to quit work at his shop and that it would

keep her from coming in contact with those he was jealous of; that he had no intention at the time to cause any trouble for Hurt, or to do him any harm.

After reviewing the facts, the court held that the evidence was insufficient to support a verdict of guilty against the defendant Baldock.

In Evinger v. State, 57 Okla. Cr. 63, 45 Pac. (2d) 552, this court adhered to its holdings heretofore upon the facts as presented, and held that the testimony was not sufficient to sustain a conviction against Evinger, who was at the filling station with the man who committed the crime, but outside of his presence there with him took no part in the shooting.

If all the evidence in the case except the evidence of the state be eliminated, the state's evidence is insufficient to support the verdict rendered against the defendant Felix Morrison, and the court committed a fundamental error in overruling the motion for a new trial when the entire evidence is considered, which should be done upon a motion for a new trial, and it is remembered that the veracity of the defendant is not questioned by the state, said error of the trial court is emphasized. While it is well settled that this court will not disturb the verdict on account of the evidence when there is any competent evidence to support it, the converse rule is equally well settled that it is not only the province but the duty of the court to set aside the verdict when it is contrary to the evidence, or where there is no evidence to support it.

The defendant George Morrison, in support of his motion for a new trial, insists that the court admitted improper testimony against him. As shown by the testimony, the defendant George Morrison and the deceased, Sim Cook, were both at the schoolhouse where the basket

ball game was being played, and Cook spoke to the defendant, and they walked away from the schoolhouse, and passed beyond some cars into the dark. The testimony does not disclose what passed between the defendant George Morrison and the deceased, except that witnesses say they heard a kind of a thud, like some one had been struck with something, and discovered the defendant George Morrison was on the ground with the deceased standing over or near him leaning slightly forward; defendant says the deceased struck him with his pistol and knocked him down, and he feared the deceased was going to shoot him and he immediately drew his pistol and fired while lying on the ground.

All of the testimony for the state and the defendants admits the defendant George Morrison was on the ground with the deceased near him at the time the shot was fired, and that the deceased was armed, his pistol being found near his feet after a light was secured and the parties gathered around the scene of the difficulty.

The defendant urges that the admission, over his objection, of the testimony of the evidence taken at the preliminary trial of Dee McCuen was prejudicial error, for the reason that the testimony was not sufficient to show due diligence had been used by the state. McCuen's home, as shown by the record, was at Woodville, but he was somewhere in the state working for the Prairie Pipe Line Company. The witness Dillow, who tried to serve him, was asked if he got in touch with the pipe line company, and answered, "No, sir, we had no authority to do that." The sheriff also stated he made inquiry at Woodville as to where Dee McCuen was, and they said he left three or four months ago, and was in Oklahoma or Kansas; he did not talk with his father or mother, talked with his brother who said he was supposed to be in Oklahoma City or Kan-

sas working for an oil company. Witness further stated, "I did not try to locate him through the company he was working for, I could not get service on him that way."

They then showed by the court clerk that a subpoena had been issued. The county attorney testified he went to Woodville to look up his witnesses and was advised that Dee McCuen was working for the Prairie Pipe Line Company, and "I did not know where I could find him; he was in Oklahoma, or might be up in Kansas." On cross-examination the county attorney stated he did not make any effort to locate him through the pipe line company.

This testimony fails to show diligence on the part of the officers of the state to locate the witness. This court will take judicial notice of the fact that if the witnesses were working for a pipe line company or an oil company, that the company would have a record of the witnesses' whereabouts, and it would be no trouble to locate him, as all companies keep a list of employees and where they are assigned for work.

It is further contended that there was not sufficient predicate laid for the admission of the evidence in the transcript, that it was not made to appear by competent evidence that the witness McCuen was absent from the state, sick, or unable to attend the trial, and no proper diligence to procure the attendance of the witness was used. Davis v. State, 20 Okla. Cr. 203, 201 Pac. 1001; Golden v. State, 23 Okla. Cr. 243, 214 Pac. 946.

It has been held by this court in many cases that where a witness has testified at the preliminary against an accused, and has been cross-examined, or the privilege of cross-examination offered, if at a subsequent trial involving the same issue it is satisfactorily made to appear that the witness has died, has become insane, or has per-

manently left the state, without collusion or procurement, or is sick and unable to attend, or his whereabouts cannot with due diligence be obtained, a transcript of the testimony of such witness may be introduced as his evidence, and the use thereof will not be a violation of the constitutional right of the accused to be confronted with the witnesses against him. Davis v. State, supra; Exleton v. State, 30 Okla. Cr. 224, 235 Pac. 627.

Before the transcript of the evidence of a witness given at a former trial is admitted, there should be a showing that the witness cannot be produced, due to some one of the exceptions named. The admission of this class of evidence should be strictly observed since it is obvious that the privilege is subject to abuse and that the witness who is perfunctorily heard at the preliminary hearing might be purposely out of reach of the process of the court, where it might be of interest to the state to avoid further cross-examination by use of the transcript of their former testimony.

It is generally held that where the witness is temporarily absent from the state, or out of the jurisdiction of the court, and proper diligence has not been observed to procure his attendance, a transcript of the evidence should be rejected.

The rule admitting a transcript of evidence of an absent witness as his deposition on final trial grows out of circumstances of necessity, and such transcript or deposition should be excluded in all cases where the witness can be produced in person. One of the reasons of this is the accused may desire to cross-examine the witness further, and the jury, if it is possible, should have the opportunity to observe the witness and his demeanor on the witness stand.

We do not think the state used due diligence in trying to secure the attendance of the witness McCuen, as the testimony of the state clearly shows no effort was made to learn from the oil company for whom he was working his whereabouts in the state. We hold that the admission of the transcript of evidence of the witness McCuen, taken at the preliminary trial, was prejudicial to the rights of the defendant. Davis v. State, supra; Alexander et al. v. State, 51 Okla. Cr. 1, 299 Pac. 237; Golden v. State, 23 Okla. Cr. 243, 214 Pac. 946.

It is next contended by the defendant that the testimony of John Ayers and Dee McCuen was in the nature of hearsay evidence, and was not a part of the res gestae. The statements claimed to have been made by the deceased in the presence of John Ayers and Dee McCuen were statements made in the absence of the defendant George Morrison, and did not relate to the difficulty between the defendant and the deceased.

The statements claimed to have been made by the witnesses in their testimony being as follows (John Ayers stated):

"I was at the basket ball game and saw Sim Cook a short while before he was killed; neither George or Felix Morrison was present at the time of the conversation. Cook came up and asked me if I had seen Dee McCuen, and I told him I did not think I had; he asked me if McCuen was going to play that night, and I said, 'No'; he said, 'Have you seen McCuen?' and I replied, 'No'; he kindly looked at me and I look at him, and he said, 'The reason I am asking the question I have information that George Morrison is going to deliver Dee McCuen some whisky tonight, and I am going to try to catch him if he does.'"

Dee McCuen's testimony taken at the preliminary trial, complained of as being hearsay evidence, stated he was at the schoolhouse the night Sim Cook was killed:

"I had seen George Morrison that evening; I went to see him looking for some whisky; he told me he did not have any whisky; he told me he would see me that night; we were both at the meeting that night."

"Question by County Attorney: With that you understood he would deliver it that night, that is what he said he would do? A. He said he would see me that night. Q. You understood that is what he meant?"

Witness further stated he had bought whisky from George Morrison one time about two months prior to the night of the difficulty. The testimony of both McCuen and Ayers was hearsay.

Hearsay evidence is not admissible. It tends to prejudice the jury against a defendant and leaves the defendant in a position where he cannot contradict the hearsay statements made by the witness. In this case the hearsay statements made by the witnesses are highly prejudicial to the rights of the defendant George Morrison, for the reason that the facts in this case show that the defendant, at the time the shot was fired, fired from the ground and while the deceased was standing over him with his pistol, and there is a total failure of testimony in the record showing that the trouble between the deceased and the defendant arose from any attempt to arrest George or to try to find whisky. The defendant George Morrison testified that the only difficulty between him and the deceased was a small debt the deceased claimed he owed him.

This court has repeatedly held that hearsay evidence which has been admitted, which contributes to the verdict of guilty, the reception of such evidence does not constitute harmless error, but is grounds for reversal. McRae v. State, 8 Okla. Cr. 483, 129 Pac. 71; Bohannon v. State, 24 Okla. Cr. 103, 215 Pac. 1078; Ward v. State, 17 Okla. Cr. 713, 188 Pac. 894.

The statement of the witnesses Ayers and McCuen was hearsay and inflammatory, and prejudiced the rights of this defendant.

We hold that the testimony in the case as to Felix Morrison is wholly insufficient to sustain the verdict and judgment, and the case is remanded, and as the conviction of Felix Morrison of any offense cannot be legally had under the evidence in the case, the trial court is directed to enter an order discharging the defendant Felix Morrison in said case.

We further hold that the admission of the testimony of Dee McCuen, taken at the preliminary trial, was inadmissible and inflammatory, and contributed largely to the conviction of George Morrison; and that the evidence of John Ayers was incompetent and inadmissible. For the reasons herein stated, the case as to George Morrison is reversed and remanded, with directions to proceed further according to law.

EDWARDS, P. J., not participating.

DOYLE, J., concurs.