RICHARD STARKS v. STATE.

No. A-9577.  Aug. 11, 1939.

(93 P. 2d 50.)

W. L. Steger and R. N. Allen, both of Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J.  Plaintiff in error, Richard Starks, was informed against for the murder of Otis L. Hutton, and upon his trial was convicted of manslaughter in the first degree. The jury was unable to agree upon the punishment. Motion for new trial was overruled April 22, 1938. The judgment and sentence of the court was that the defendant serve a term of 20 years' imprisonment in the state penitentiary.

From the judgment and sentence he has appealed to this court.

The first and second assignments of error are the usual ones, that the verdict is contrary to the law and to the evidence.

The only other assignments of error are based upon the rulings of the court in admitting, over the objections of the defendant, evidence showing or tending to show that the defendant had been guilty of offenses other than the one charged in the information.

As this is the only substantial question raised on this appeal, we will state the evidence in some detail.

It appears that the defendant and the deceased were residents of Durant, and both were at the east front of the Greenwade dance hall, on East Main street, about 9 o'clock p. m. October 28, 1937, when the defendant struck Mr. Hutton on the head with a heavy club, resulting in his death about five hours later.

Dr. R. E. Sawyer, the first witness, testified that O. L. Hutton was brought to his hospital in an unconscious condition; he had a wound on the back of his head about four inches long that caused his death four or five hours later; that Mr. Hutton's clothes were searched; they did not find any weapon, not even a pocketknife.

Ike McCoy testified that he answered a call at 9 p. m., and found O. L. Hutton in an unconscious condition, and he delivered him to the Evergreen Hospital; five hours later he removed the body to the funeral home.

John E. Williams, sheriff of Bryan county, testified that he made an investigation at the Greenwade dance platform, and found an instrument, "State's Exhibit 1," standing up against the dance platform near the northeast corner; that he exhibited it to the defendant and he said that was what he used on Mr. Hutton.

On cross-examination he stated that he was present when the clothes that Mr. Hutton had on were removed;

that they searched the pockets, but did not find anything; that the defendant surrendered himself about an hour later.

O. L. Thomas testified:

"I was standing near the east front steps of the dance platform, about 9 o'clock when Mr. Hutton fell beside me, I tried to, but could not lift him up, I stood there until the ambulance came."

Harry Sparger, Jr., testified:

"I was standing on the fender of a pick-up at the east end of the Greenwade dance platform, I saw the Starks boy come up acting like he was drunk, he stood around a minute, laughing and talking with the boys, then he ran by and picked up a club, Mr. Hutton was standing by the pick-up and the Starks boy sneaked up behind him with this club, raised, I thought he was playing, and hit Mr. Hutton on the head and he fell, somebody started to pick Mr. Hutton up and Stark said, 'Let him lie there, let him alone,' and walked off through the crowd."

Edwin Dunn testified:

"I was standing on a pick-up fender; I saw Mr. Hutton standing there and the Starks boy ran behind the pick-up, I heard something pop, and turned around; Mr. Hutton was falling, Starks was standing there with a club in his hand, a man tried to pick Hutton up and Starks shook the stick at him, and told him to leave him alone, and the man dropped Hutton."

Homer Hall testified:

"I was standing at the dance hall, Mr. Hutton came up and was standing there about 20 minutes; Starks came up behind him, I heard something pop, and Hutton fell and somebody started to pick up Hutton and Starks told him to leave him alone."

Dovie Hawkins testified:

"I was standing there at the dance platform with three other girls, and this man Hutton was facing the

dance hall, I was about 25 feet from him and Richard walked up from behind and hit him over the head and walked off."

Mrs. O. L. Hutton, widow of the deceased, testified:

"I have seen the defendant off and on with Bonnie Hallbrook, my husband's niece. Last September, January, and along in March the defendant visited our home. He came there to see Bonnie. My husband did not want him there and told him to get out; Bonnie had a miscarriage."

She further testified as follows:

"Q. Without telling what she said or who she named, did she at anytime tell you or Mr. Hutton who the father of that child was? By Mr. Steger: Objected to as incompetent, irrelevant and immaterial. By Mr. Carter: I asked her if she told her? By the Court: That is admissible. Don't tell who the man was. Q. Did she at any time give the information to you or Mr. Hutton who the father of that child was? A. To me. Q. Did you communicate that to Mr. O. L. Hutton? (Objection overruled. Exception.) A. Yes, he suspected it. By the Court: Did he tell you, or rather did she tell you and did you tell your husband that? A. Yes, sir."

She further testified:

"Richard Starks came to our home another time and my husband told him to get out that he did not want him there, and he stood there like he was not going to go; my husband told him that he was responsible for her condition, and he did not want him there. He took a few steps towards Richard and told him he was an ex-convict, and then Richard left." Motion to strike overruled. "That after Bonnie was able to be up she went to the postoffice with her, they met Richard Starks, he stopped and talked to us, and he said it made him so mad to have my husband order him out, that he started home and came back and waited for him to come down and said he was going to pick up something and knock him cold if he did come down; that her husband was an ex-service man, that he was in bad health; that he had an operation and one of his lungs was taken out and that he wore an elastic stocking, furnished by the Veteran's Bureau."

At the close of the evidence in chief, the defendant interposed a general demurrer, which was overruled.

On the part of the defense, Bonnie Hughes testified:

"My age is 23 years, I stayed with my folks at Durant, I know Richard Starks, he has had lots of dates with me, he came out to Mr. Hutton's house where I stayed; one night we went to the show, came back and Uncle Otis was drinking and he asked if I had a drink, I said, 'No' and he said, 'Come on, Bonnie, tell me if you haven't got a drink,' and I said, 'Here is the empty bottle on the table.' He said, 'Don't lie to me.' He acted like he was going to jump on both of us and said he was going to throw us out of the window. He called Richard a jail bird and called him Starks, and said he didn't want me to go out with him, because he didn't think I was in good company, and he didn't think that Richard was good enough for me. He said he was going to kill Richard not less than half a dozen times, and I told Richard every time. My uncle had a long pocketknife, my uncle was kind of quarrelsome, and was always causing trouble when Richard was around."

Her cross-examination was in part as follows:

"Q. Wasn't that trouble at the house when he told Richard thát he was responsible for your condition and told him not to come over there any more, isn't that the first time he told Richard that he did not want him going with you? A. It might have been. Q. Now, Miss Bonnie, I am reading from your statement that you made over at Sulphur, 'Who was the father of the child? A. Richard Starks. Q. You are pregnant at this time? A. Yes, sir. Q. Who is the father of that child? A. Richard Starks. Q. Your uncle suspicioned about it at that time? A. Yes, sir. Q. And that is the reason he forbid Richard Starks coming to the house any more? A. I never heard him say much about Richard until then.' Q. Miss Bonnie, did you make that statement? A. I suppose I did if it is down there."

R. J. Walters testified that he was running a pop stand at the dance hall that night, also running a filling station on Main street, across from the dance hall, that Mr. Hutton borrowed 10 cents from him at the dance,

saying he wanted that dime to go to the dance, that he went to the dance and came back and asked if he could borrow an ice pick, said he might have a little trouble, and he told him he had better go home, and would not let him have it, that about ten minutes later he heard there was a fight over there, and that Hutton had been injured.

On cross-examination he stated that his mother had a petition filed with the county judge to have him declared insane and sent to the asylum and the doctors pronounced him sane and his mother withdrew the petition.

Robert Brown testified that he had known the defendant 15 years, that he was at the dance hall that night and saw Otis Hutton and Richard Starks there, that he was talking to Richard Starks and Hutton walked up towards them and Richard said, "Hello, Otis." Hutton did not answer him and commenced cursing and calling him all kind of names, son-of-a-bitch, and about everything like that, and acted like he wanted to fight, that Hutton was drunk, that he did not see Richard Starks hit Hutton. That he knows Hootie Sparger, but did not see him in company with some other young man there that night.

Ferry Ferrell testified that she was at the dance there that night, and saw Otis Hutton and Richard Starks there; that Mr. Hutton came on the platform and wanted in on 15 cents, and they would not let him in and he turned and walked off the platform and said something to Richard and a word or two were exchanged. Three or four minutes later she saw Mr. Hutton down; that she could not hear what was said.

Richard Starks, as a witness in his own behalf, testified: "I knew Otis Hutton about a year," handed exhibit "A," he said:

"I hit him with that because I was afraid of him. Bonnie Hughes had told me about him threatening to kill me; I was standing on the south side of the dance hall and decided to go home, and went around in front

to tell Robert Brown. Otis Hutton was standing on the steps talking to some one and he turned around and said, 'Hello, you God damn son-of-a-bitch.' I walked up the steps and asked him what was wrong with him, he said nothing was wrong with him, and asked me what was the matter with me, I stepped off from him and he followed me, he began cursing me and said he ought to send me to the penitentiary, and said, 'If you say two damn words I will,' I asked him what I had done and he said, 'You have done damn plenty, and if you say two words I will do it.' He called me a son-of-a-bitch and kept cursing and threatening me, and ran his hand in his right hand pants pocket and I grabbed this club and hit him, he staggered and fell forward, after I hit him some men came up and picked him up, I said, 'Don't bother him.' I did not intend to kill him at the time I hit him. I was going regularly with Bonnie Hughes, I was convicted of car theft and was sentenced to serve a term of five years, I served 14 months and 14 days and was out on parole when this trouble occurred, Mr. Hutton knew that I was out on parole and he tried to get my parole revoked."

He further testified:

"Q. Now, you heard this testimony here relative to you and Bonnie Hughes, about that difficulty out in the kitchen, how long was that before you had this difficulty down at the dance hall in which Hutton lost his life?  A. I don't know exactly, I imagine about six months.  Q. Were you going with Bonnie?  A. Yes, sir, regularly."

His cross-examination was in part as follows:

"Q. Richard, why was he mad at you? A. Only because I was going with his niece.  Q. You are the father of that child she had? (Objected to as improper cross-examination.)  By the Court: Sustained.  Q. Do you remember the occasion when you were over at the house? A. Yes, sir.  Q. Do you remember the testimony of Mrs. Bonnie Hallbrock and Mrs. Otis Hutton?  A. Yes, sir. Q. Was that about the way it happened?  A. Let me tell it.  I was up at Bonnie Hughes'—we came in from the show and we were sitting in the kitchen by the table. Q. About the time I am talking about when he told you not to come back to his house any more, you know when Bonnie was sick in bed?  A. I went in the room and Otis

was sitting on that side of the room. (Indicating.) Q. What did you go up there for? A. To take some medicine. Q. Go ahead. A. And he got up and told me to get my God damn ass out of there. Q. Didn't he tell you he thought you was responsible for Bonnie's condition? A. No, sir. Q. Had Bonnie told you what he had said before that time? A. Yes, sir. Q. Did Bonnie tell you why he was mad? A. She told me he was always threatening me, and was going to kill me. Q. You killed him, didn't you Richard? A. I hit him. Q. And killed him, that is the stick there? A. Yes, sir. Q. How old are you? A. 21 now. Q. You are six feet? A. Yes, sir, about. Q. Did you see any kind of weapon, gun, knife or knucks? A. No, sir. Q. This is your statement that you made in my office, and which was read to you, and you signed your name before Mr. Loper? A. Yes, sir."

It is contended that the court committed error prejudicial to the defendant in admitting the testimony of the widow of the deceased, wherein she states that the niece of the deceased had a miscarriage and told her that the defendant was the father of that child, and that she communicated that to her husband.

It is a general rule that the charge upon which a defendant is being tried cannot be supported by proof of his having committed other offenses; but evidence which legitimately tends to support the charge is not to be excluded on the ground that it will show other offenses.

Evidence of a crime different from the one charged is never admissible, except for the purpose of showing motive, intent, guilty knowledge or where to make out the crime charged the intent with which the act is done is material.

The evidence fails to show that the defendant was present when this statement was made, and for this reason we think that this testimony was incompetent. The question therefore arises, Was the testimony complained of, in the light of all the evidence in the case, prejudicial to the substantial rights of the defendant? Otherwise

stated, Did the admission of this testimony deprive the defendant of a fair and impartial trial? The question can be properly determined by a consideration of all the evidence in the case. This we have done, and our conclusion is, in the light of all the testimony in this case, the testimony objected to, although improper as being hearsay, was not prejudicial to the defendant.

We are also of the opinion that the objection to the testimony in question was waived by the defendant when he afterwards introduced the same evidence himself. It is well settled that if a party objects to the introduction of evidence, which is admitted, and afterwards introduces the same evidence himself, it is not ground for reversing the judgment, although the evidence objected to was incompetent.

It is also contended that the court erred in permitting the prosecution to cross-examine the witness Bonnie Hughes as to her meretricious relations with the defendant.

We think that the cross-examination was properly permitted. The evidence on behalf of the state tends to show that the motive for the killing was malice, resentment and revenge, because the deceased had sought to prevent his niece from associating with the defendant.

The fact that the incidental effect of the cross-examination is to degrade a witness examined does not render it improper.

In Cannon v. Territory, 1 Okla. Cr. 600, 99 P. 622, this court held:

"A witness for the defendant may be cross-examined as to specific acts tending to discredit her, when such facts are relevant to the issue."

In Castleberry v. State, 10 Okla. Cr. 504, 139 P. 132, this court held:

"The state has the right, on cross-examination, to show the nature of the relations existing between the witness and the defendant, so far as their relations are such as would create a bias that might reasonably be supposed to affect the credibility of the witness, and this rule cannot be changed by the fact that such evidence would probably prejudice the defendant in the minds of the jury."

In the opinion it is said:

"The doctrine that a witness may be cross-examined as to matters going to credibility may well be regarded as an exception to the rule that cross-examination is to be confined to matters touched on in the examination in chief, and the limits within which either party may cross-examine upon matters not strictly relevant, but which affect the credibility of the witness, is largely within the discretion of the trial court, but the privilege of degrading a witness by proof of disreputable conduct, not connected with the facts on trial, is one so liable to abuse that it should be closely guarded and allowed only upon the exercise of sound judicial discretion, and then only to affect the credibility of the witness.

"The witness, Ruth Brady, testified on her cross-examination that she was the sweetheart of the defendant. Here we have a very powerful motive for testimony in his behalf. She identified and admitted the photograph which shows that witness, in the presence of a third person, permitted the defendant to take indecent liberties with her person. We think the entire evidence upon the cross-examination, including the photograph, was properly admitted, as showing the nature of the relations existing between the witness and the defendant, and that their relations were such as would create a bias on the part of the witness that might reasonably be supposed to affect her credibility, and the fact that such evidence would probably prejudice the defendant in the minds of the jury did not affect its admissibility."

In Stogsdill v. State, 24 Okla. Cr. 152, 216 P. 681, this court held:

"Explanatory circumstances and declarations connected with the commission of a homicide, which have a tendency to shed light on the motives of the parties, are

admissible in evidence, including antecedent declarations made by the deceased and those acting in concert with him, where they form some link in the chain of circumstances explanatory of their motives or other vital issues involved."

Having considered the errors assigned, we find no error which would authorize this court in reversing the conviction. There can be no doubt as to the sufficiency of the evidence. That the defendant killed the deceased he did not deny. His defense was that he killed the deceased in his necessary self-defense. It is enough to say that whatever there was of that defense, no one can reasonably claim that it was not properly submitted to the jury, and the jury by their verdict have found that defense untenable. We are satisfied from an examination of the record and upon a consideration of the proceedings of the trial with respect to its fairness, that the defendant had a fair and impartial trial. We find nothing in the record to lead us to believe that the punishment imposed is excessive.

It follows that the judgment rendered upon the verdict must be, and the same is hereby, affirmed.

BAREFOOT and DAVENPORT, JJ., concur.