Dennie H. **JONES**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F-74-31.

Court of Criminal Appeals of Oklahoma.

June 12, 1974.

Henry, West & Sill, Shawnee, for appellant.

Larry Derryberry, Atty. Gen., John L. Clifton, Dist. Atty., Pottawatomie County, Stephen C. Lewis, Asst. Dist. Atty., Pottawatomie County, for appellee.

OPINION

BUSSEY, Judge:

Appellant, Dennie H. Jones, hereinafter referred to as defendant, was charged and tried in the District Court, Pottawatomie County, for the crime of Murder. He was found guilty by jury verdict of the offense of Manslaughter, First Degree, and his punishment was fixed at Forty-five (45) years imprisonment. From said judgment and sentence, a timely appeal has been perfected to this Court.

Between 9:30 and 11:30 the morning of December 30, 1972, Patty Tucker was killed by a gunshot wound to the head while she was alone with the defendant in the home of Charley Joe Johnson, located several miles from Wanette. The death weapon was the defendant's revolver.

At his trial for her murder, the defendant denied that he shot Patty Tucker and contended that she must have committed suicide. On the basis of circumstantial evidence, the jury found the defendant guilty of killing her.

A summary of the lengthy transcript reveals that the following evidence was adduced at trial. The deceased was the defendant's 17 year old niece and she was in his legal custody. Approximately two and a half years prior to her death, she had come from California to live with the defendant and his family and remained with them until she ran away in the summer of 1972. During the time Patty lived in the defendant's home, she and the defendant had engaged in an illicit sexual relationship. Shortly after leaving the defendant's home, Patty met and began living with a young man named Tommy Taylor. Patty and Tommy first resided in Oklahoma City, then moved to Broken Bow, and returned to Oklahoma City in October, 1972, where they remained until December 28, 1972, when Patty left Oklahoma City with the defendant and her grandmother. Around 1:00 p. m. on that date the defendant appeared at the Four Palms Tavern, an establishment owned by Tommy's mother, and had a lengthy discussion with Patty

trying to persuade her to let him take her back to her parents in California. According to Mrs. Taylor's testimony, when Patty told the defendant that she would not go with him, he kept begging her to go and, as he would not leave the premises when Mrs. Taylor asked him to, she called the Nicoma Park police. Officer J. D. Robertson, who responded to that call, testified that he went to the tavern and talked with the defendant, Mrs. Taylor, Tommy Taylor and the deceased. The officer related that Patty advised him that she was in defendant's custody and that he wanted to take her to California, but that she did not want to go because on numerous previous occasions he had forced her to have sexual relations with him. Officer Robertson stated that the discussion was peaceful and concluded with Patty agreeing that she would go with defendant if her grandmother accompanied them.

Testimony revealed that several hours later the defendant returned to the tavern with his mother, Patty's grandmother, and that Mrs. Taylor went with them to look for Patty and Tommy. A short time later they found them, whereupon Tommy took Patty to the Midwest City Police Station. The defendant, his mother and Tommy's mother followed and upon arriving at the station, a discussion ensued between the parties and Officers Crumpler and Tuberville of the Juvenile Division. The officers testified that Patty expressed fear of going with her uncle because in the past he had forced her to have sexual relations and had threatened her; Mrs. Taylor told them that she believed the defendant had a gun as she had observed a bulge under his jacket. The defendant denied all these allegations and the officers advised Patty that since she was in her uncle's legal custody, if she chose not to go with him, she would have to remain in Berry House pending the Juvenile Court's determination of a proper placement for her. Patty then agreed that if her grandmother would accompany them, she would go with defendant. She began to cry and left the police station.

Tommy Taylor testified that they all then went to the apartment so Patty could get her clothes and that Patty tried to run away by climbing out the back window, but she abandoned that effort when she saw her grandmother standing below. He and his mother last saw Patty as the defendant led her to his car with a hand on each of her shoulders.

Bluford Tucker, Patty's father, testified that he resided in California and that on the afternoon in question he returned a call to Patty and she told him that the defendant and her grandmother were in town looking for her and that she did not want to leave Oklahoma City with them and that she wanted to marry Tommy Taylor. Mr. Tucker said that the conversation ended with his advising Patty to call the police if defendant and her grandmother bothered her anymore.

Testimony of the defendant and his wife, Betty Jones, reflected that after leaving Oklahoma City the defendant, deceased and the grandmother went to the Jones' home outside of Lexington and that Patty spent the night there.

Charley Joe Johnson, a longtime acquaintance of the defendant, testified that the morning of December 29, the deceased and defendant came to his house and that Patty was "disturbed" (Tr 79); further details of Mr. Johnson's testimony regarding Patty's demeanor on that date is set forth below in the Court's discussion of defendant's third proposition. On direct examination, Mr. Johnson testified that the defendant had asked him if he could stay in his home a few days, however, on cross-examination he changed his testimony to reflect that the defendant had requested his permission for both Patty and himself to stay in his home. According to Mr. Johnson, the defendant and deceased then left his home and did not return until the next morning around 8:30, when the defendant again requested Mr. Johnson's permission for Patty to stay in his home for a few days until he (defendant) could get the money to take her to California. Mr.

Johnson agreed to this request, left his home around 9:30 and testified that when he left, the defendant and Patty were playing cards.

The defendant testified on his own behalf and stated that although Patty did not want to go to California, he had not forced her to leave Oklahoma City with him. He stated that she loved him and that in the past they did have an affair, however, he had realized that this relationship was wrong. He testified that he had wanted to take her to California because her parents kept threatening him. The defendant stated that he had requested permission from Charley Johnson for Patty and his mother to stay in Mr. Johnson's home. Further, that he had wanted Patty to stay with Charley Johnson because his wife considered Patty to be a bad influence on their girls and they had words about her staying in their home. Concerning the day of the shooting, the defendant testified that before leaving for Charley's that morning, he had placed his .38 caliber pistol between the seats of his car as he was going to pawn it in an attempt to raise money for the trip to California. Recounting the events preceding the shooting, he stated that after Charley left, he and the deceased went to eat, they they returned to Charley's and shortly thereafter he went out to his car to get some cigarettes. He said that when he came back to the house he found that Patty had removed all of her clothing and that she "kept forcing herself" (Tr 457) on him until he finally had intercourse with her. He testified that after having intercourse, Patty tried to persuade him to run away with her as she did not want to return to California but that he had refused, advising her that his place was with his family. On cross-examination he stated that Patty did not mention anything about Tommy on the day of her death. This testimony was in direct contradiction to a pre-trial statement the defendant gave to law enforcement officers while he was being questioned about the shooting. The statement was introduced in evidence and in it the defendant

had related that immediately subsequent to having intercourse, the deceased told him that she was going to return to Tommy Taylor. The defendant testified that he then played cards and the deceased began reading and that after a short time he went out to the outside bathroom. He testified that while he was in the bathroom, he heard a shot, ran into the house and found Patty slumped over the divan with one arm up on the divan. He stated that he tried to pick her up and couldn't so he laid her down on the floor and went to the neighbor's for help.

Mrs. Linda Spray, a neighbor of Charley Johnson's, testified that around 11:30 a. m. the defendant came running up to her home, that he looked "wild", and was exclaiming "My God, lady, call an ambulance, my niece just shot herself in the head!" (Tr 106).

For his first proposition, defendant asserts error by the trial court in overruling his demurrer to the evidence, challenging the circumstantial evidence presented at trial as being insufficient to establish the corpus delicti.

Consideration of this proposition requires application of the following authorities to the evidence presented at trial. Title 21 O.S.1971, § 693 provides that:

"No person can be convicted of murder or manslaughter, or of aiding suicide, unless the death of the person alleged to have been killed and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt."

Speaking to this point in Mayberry v. State, Okl.Cr., 449 P.2d 912 (1969), this Court set forth the following directive as quoted from Edwards v. State, Okl.Cr., 48 P.2d 1087 (1935):

"In every criminal prosecution the burden rests upon the state of proving the corpus delicti beyond a reasonable doubt. In prosecution for homicide the corpus delicti consists of two fundamental and necessary facts: First, the death; second, the criminal agency of another as the cause; as applicable to this case, it was necessary to show, first, that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted by the defendant."

■ Of course proof of the corpus delicti is not dependent upon direct and positive evidence, it may be proved by circumstantial evidence. In the case of Leeks v. State, 95 Okl.Cr. 326, 245 P.2d 764 (1952), the Court set forth the following standard of proof which is required when, as with this unwitnessed shooting, purely circumstantial evidence is relied on for proof of the corpus delicti:

"When it [corpus delicti] is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt." at 769.

In the instant matter, proof beyond a reasonable doubt of the first element of the corpus delicti, Patty Tucker's violent and unnatural death resulting from a gunshot wound, was uncontroverted. Medical testimony established that the certain cause of her death was a gunshot wound to the left forehead. Specifically, the State's evidence revealed that a bullet fired from the defendant's .38 caliber Smith and Wesson revolver entered Patty's left forehead approximately three inches from the apex of the skull and one-half inch left of the midline, at the edge of the hairline, with the bullet following a slight downward course of approximately three degrees.

Given Patty Tucker's unnatural and violent death, we must next examine the sufficiency of the evidence upon which the jury determined that the defendant's unlawful infliction of the fatal wound was proved beyond a reasonable doubt. On page nine of his brief, the defendant admits that since he was the only person present in the vicinity at the time of the shooting, he "was probably guilty if any crime was committed." He further admits that the circumstantial evidence produced

at trial showed the following: that he and the deceased had an illicit sexual relationship; that the deceased was killed by a bullet fired from his gun; that the trajectory of the bullet was at a slight downward angle and, although not impossible, it would not be the most expected trajectory in a suicide shooting; that no powder burns were found on the deceased, indicating the fatal wound was not a contact wound and that the weapon would probably have been some distance from her body when discharged.

In support of his contention that the evidence presented at trial was insufficient to support the verdict, defendant relies primarily on the case of Cole v. State, Okl. Cr., 467 P.2d 511 (1970), wherein we held that circumstantial evidence had not established the corpus delicti of homicide beyond a reasonable doubt.[1] He attempts to persuade the Court that the facts of this case are so analogous to those in *Cole*, supra, that the instant matter should also be reversed for insufficient evidence of the commission of a crime. We disagree that this case is analogous to the factual situation in *Cole*, supra, and in fact, we find that the only similarities are, that in both cases: the deceased died of a gunshot wound suffered when no one other than the defendant was present; the death weapon belonged to the defendant; and the suicide of the deceased was presented as a defense.

We do not agree with the defendant's position that here, as in *Cole*, no motive for the killing was shown. As indicated above, it was uncontradicted and in fact confirmed by the defendant, that he and the deceased had engaged in an illicit sexual relationship for a considerable length of time. The sole point of dispute, which is a matter of utmost significance here, concerned the voluntary nature of Patty's participation in this relationship.

The resolution of the conflicting testimony was of course a matter properly within the province of the jury. We find that from the ample evidence presented at trial, the jury could have believed that her role as a sexual partner was based on force and fear and that on the day of her death she was with the defendant as a result of coercion. We agree with the State that from the entirety of the competent evidence presented to the jury, they could reasonably have found that the relationship between the defendant, a 34 year old man, and the deceased, his 17 year old niece, was based on a volatile one-sided sexual attraction and they could have found that this relationship presented a motive for the killing.

We also do not agree with defendant's contention that the absence of powder burns on Patty Tucker's body is similar to the issue of proof of powder burns in *Cole*, supra. In *Cole* the prosecution raised the question of the existence of powder burns on the deceased's clothing then failed to introduce the clothing, leaving defendant's hypothesis unrefuted. The presence or absence of powder burns would have cleared the existing doubt as to the distance from which the gun was fired, thereby either corroborating or controverting the defendant's allegation of suicide. The instant matter presents a completely unrelated situation as the undisputed testimony was that Patty's body had no powder burns. The explanatory circumstances theorized by counsel in his brief (hair, profuse bleeding, etc.) are questions of fact which could have been presented for the jury's consideration but they do not serve the intended purpose of persuading us that this cause comes within the rationale of *Cole*.

From other scientific testimony the jury learned that no fingerprints of any value were obtained from the death weapon. The results of the firing tests performed

---

1. This writer feels constrained to note that he dissented in *Cole* and still does not agree with the result reached by the majority of the Court in that decision. It is important to recognize that *Cole* was explicitly limited in its application to the factual situation presented therein and further that the decision has never been followed by the Court.

with the death weapon were introduced and the jury saw the powder patterns left when bullets were fired from various distances. Dr. Charles Marshall, forensic pathologist who performed the autopsy, testified that sperm was present in the deceased and was indicative that intercourse had occurred twenty-four to seventy-two hours previously. A live model was used to illustrate Dr. Marshall's testimony concerning the distance that the length of the deceased's arms would have enabled her to hold the gun from her body; the maximum distance was shown to be fifteen and one quarter inches. Dr. Marshall further testified that no contact burning consistent with firing tests performed at twelve and twenty-four inches was present. Counsel for defendant argues that the deceased's hair and the method of handling the body could have somehow effected the visibility and/or permanence of powder burns. However, Dr. Marshall testified that he shaved back the deceased's hair and did not find any powder burns and defendant offered no evidence concerning mishandling of the body. Further, Billy Phillips, Sheriff of Pottawatomie County, testified that he went to Charley Johnson's to investigate the shooting, that he looked for powder burns on the deceased and did not find any. Frederick Lundgren, forensic specialist, explained the Neutron Activation Analysis tests he performed on samples taken from the hands of the deceased and defendant in order to determine the presence of barium and antimony, elements which are indicia of gunshot residue. He testified that the results of both tests were negative. He further explained that the elements are water soluable and may therefore be washed away or removed by an abrasive action. Jacqueline Owen testified that on the day in question she was working as a nurse in the Shawnee Hospital where defendant was taken following the shooting and that she cleaned his hands with a wet washcloth to remove a substance which appeared to be dried blood. Other testimony revealed that the residue samples were taken from defendant's hands after they were cleaned by Nurse Owen.

■ Where circumstantial evidence is relied upon to prove a crime, it is not required that the circumstances proven shall exclude all possibility of innocence, but only that they shall be inconsistent with any reasonable hypothesis other than that of guilt. Ballard v. State, Okl.Cr., 95 P.2d 239 (1939) at 241. From reviewing the entire record, we are of the opinion that the evidence was sufficient to support the jury's conclusions that the defendant's hypothesis of suicide was unreasonable and that the State proved beyond a reasonable doubt that Patty Tucker's death resulted from the criminal agency of the defendant.

■ Defendant's second proposition urges error by the trial judge in submitting an instruction to the jury on the offense of Manslaughter, First Degree. Defendant recognizes the duty of the court to instruct the jury on lesser included offenses where the evidence will support a conviction for same, but he argues that here the evidence was insufficient and could only be interpreted as showing that if any crime was committed, that crime was Murder. From the totality of the evidence presented regarding the circumstances of the death, we find that the trial judge was correct in his determination that the evidence created a reasonable doubt as to whether or not the killing was committed with a premeditated design to effect the death and that the judge therefore properly instructed the jury on the charge of Manslaughter. Abel v. State, Okl.Cr., 507 P.2d 569 (1973).

■ Defendant next complains that certain testimony of Tommy Taylor and Bluford Tucker concerning statements made by the deceased were hearsay and that their admission over his objections constituted prejudicial error. In support of this proposition, defendant cites the case of Morrison v. State, Okl.Cr., 57 P.2d 882 (1936), however, this case is not on point. We do not feel it is necessary to set forth here the testimony complained of, as it suf-

fices to note that it comes within the well recognized exception of the hearsay rule allowing the admission of antecedent declarations of the deceased which show the state of mind of the deceased toward the defendant. See Starks v. State, Okl.Cr., 93 P.2d 50 (1939) and Lowrey v. State, Okl. Cr., 197 P.2d 637 (1948). Further, the testimony was corroborated by several other witnesses and the court properly limited the jury's consideration of the testimony with the following instruction:

"You are instructed that the Court has permitted evidence to be introduced concerning certain statements made by the deceased, outside the presence of the defendant, concerning her state of mind towards the defendant. Such evidence is proper for you to consider only insofar as it may tend to shed light on the motives of the decedent or the defendant, and you are not to consider them for any other purpose." (Tr 506)

■ In addition, the defendant asserts that Charley Joe Johnson's testimony regarding the deceased's demeanor on the day preceding her death contained improper opinion and conclusion and was erroneously admitted by the trial judge. During direct examination the witness stated that the deceased " . . . acted like she wanted to run out the front door.", and the witness explained that he got this impression because: "She jumped up and started to the front door, and I turned around and looked at her, and she looked—I never did see her look like that before. So, finally, she went back and sat down beside Mr. Jones, but I never did see a girl look so scared." (Tr 82) We note that the defendant objected only to the reference of the deceased as looking "scared" and we find that, as a whole, the testimony constituted a permissible recitation of the witness' observations of the demeanor of the deceased. Accordingly, we dismiss this assignment for lack of merit.

■ For his fourth proposition of error, the defendant asserts that the province of

the jury was invaded by the use of a live model who was used during Dr. Marshall's testimony to illustrate the distance that the length of Patty Tucker's arms would have enabled her to hold the gun from her body. He contends that this was improper in that it allowed Dr. Marshall to testify as to the position of the deceased's body at the time the shot was fired. In support of his argument defendant cites the rule as set forth in Born v. State, Okl.Cr., 397 P.2d 924 (1964), which disallows such testimony. However, this proposition is also without merit as the facts of this case do not bring it within the scope of the rule. Dr. Marshall did not express an opinion as to the position of the deceased when she was shot and in fact, on direct examination, he limited his own testimony with the following statement:

"I think it's important that I say to the jury that all I can determine in a situation like this is the angle of that muzzle in relationship to that bullet track. I cannot determine the positioning of the decedent at the time that she was shot. Only in relationship to the muzzle of the gun." (Tr 407)

On cross-examination Dr. Marshall gave the following testimony:

"Q. And you don't know what position Patty Tucker's body was in at all, do you?

"A. No, I don't." (Tr 411)

■ Lastly, defendant contends that the trial judge erred in overruling his objections to the jury panel as non-taxpayers and non-property owners were excluded by the statutory selection process existing at that time. Defendant asserts that this method of selection deprived him of a trial before a jury of his peers and argues that he should be given the benefit of a trial under 38 O.S.1971, § 18, as amended 1973, which provides that effective May 17, 1973, jurors are to be selected from the list of registered voters. Defendant presented only an oral objection to the jury panel and therefore failed to comply

with 22 O.S.1971, § 634, which requires that:

"A challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge."

Defendant also did not sustain his burden of showing prejudice as a result of the selection system (See Rooks v. State, Okl. Cr., 417 P.2d 939 [1966] and Wolfchief v. State, Okl.Cr., 461 P.2d 949 [1969]), and, as this issue was not properly preserved for review on appeal to this Court, this proposition is dismissed.

For the above and foregoing reasons, it is our opinion that the judgment and sentence appealed from should be, and the same hereby is,

Affirmed.

BLISS, P. J., and BRETT, J., concur.