## BEN KILLINGSWORTH v. STATE.

No. A-9014.   April 17, 1936.
(56 Pac. [2d]) 1200.)

Bishop & Bishop and Billingsley & Kennerly, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was by information charged with murder, was tried and convicted of manslaughter in the first degree, and his punishment fixed at imprisonment in the state penitentiary for a term of four years.

Motion for a new trial was filed, considered, overruled, and the defendant reserved an exception.

Rex Summerville in substance stated:

"I am an undertaker by profession. In the month of December, 1932, I was working for the Chadwick Funeral Home, in Seminole, Okla. I am a licensed embalmer. I prepared the body of the deceased, J. P. Morrison, for burial. In embalming the body I discovered a knife wound in the lower middle section of the abdomen, a little to the right, about two inches in length running up and down the body; the wound went through the outer tissues and muscles into the bowels. This was a fatal wound."

C. W. Shepherd, testifying for the state, stated:

"I live at Seminole, Okla.; am 60 years of age. I knew the defendant, Killingsworth, by sight, but did not know the deceased, J. P. Morrison. I saw the altercation on December 20, 1932, which took place in front of the First State Bank of Seminole. When I came up these men were having a heated argument, something was said about a debt the deceased was supposed to owe the defendant; they called each other damn liars, and other bad names, and finally struck each other a time or two. I saw the defendant reach down to the pavement and pick up his glasses, and hit the deceased in the stomach. About that time Henry Lewis, the policeman, came up and stopped the fight, and started to the police station with the parties. About the time they reached the barbershop the deceased fell on the sidewalk, and the barber came out and removed his clothing and on examination found a cut in the middle section in the vicinity of the abdomen, a little bit to the right."

Jess Freeman testified:

"I had known the defendant about four years. I lived on his place for a year. The defendant and I was engaged in a conversation at the corner of the First State Bank in Seminole at the time the deceased came up and butted in. The difficulty occurred about as related by Rex Sum-

merville. Just before the deceased fell on the sidewalk the defendant dropped a bloody knife in my pocket."

Virgil McAnally testified in substance:

"At the time of the altercation I did not know either one of the parties engaged in it. I heard the two gentlemen have a few words, and heard them mention an account of $5. The defendant called the deceased a no good s—— of — b—— several times. I saw them run together, and saw the defendant hit the deceased as he came up from picking up his glasses."

A number of other witnesses testified in substance the same as did the witness Virgil McAnally.

Henry Lewis, the policeman in Seminole, stated at the time of this trouble between the defendant and deceased, on the 20th day of December, 1932:

"I was a third of the way across the street between the First State Bank and First National Bank when my attention was attracted to this trouble, and I heard them getting louder and louder. I turned and went back and parted them as quickly as I could. It seems to me that Killingsworth hit the first lick; I saw no weapons. I started to jail with them, one on each side, and Morrison fell just across the alley in front of the tin barbershop, and I placed the defendant in jail."

The defendant, testifying in his own behalf, stated:

"I have lived in Seminole for eight years. I am a carpenter. I have known the deceased three or four months prior to this trouble.

"The deceased lived in a house belonging to a Mr. Malone, of Ozark, Ark., and I was collecting the rent on the property. I stood good for the gas and water bill, and, when the 1st of December came, he would not pay the gas bill and the water bill, which was $4.25. A man by the name of Parker was also living in one of the Malone houses. On the 15th of December I met Parker

and had a conversation with him, and he told me Morrison was mad about the gas bill and said if I did not keep my bill out of his business he was going to kill me.

"Mr. Freeman and I met at the front of the First State Bank, on the corner near the sidewalk. Mr. Morrison came up to where we were; he was mad. He talked like he did not like the way things were going. We talked about the gas bill and rent, and he finally struck me a lick on the side of the head, the force of the lick knocked my hat and glasses off; somebody picked up my hat and glasses for me. We went to quarreling, and kindly started together, and he jerked and hit me right hard on my head. I saw something dark in his hand, I don't know what it was, it was some kind of a weight. He was striking over all the time, I could not knock his licks off. I struck him and hit him in the face with my fist; he then struck me in my face with the weight. I would have fallen down but fell against some one near me or a post. He rushed me, came on up; my hat and glasses were gone, I could just see a bulk of him, and I put my hand over my head (that way) as he came up; we came together again. I guess I cut him; I was afraid he was going to beat me to death with the weight, or whatever he had. I got the knife, I don't know whether I ever opened it or not; I do not know whether I cut him or not, I just got the knife out. When Lewis arrested me the knife was still in my hand; it was shut. As I went down the street I passed somebody, I don't know who it was, I gave the knife to him. Lewis was along by the side of me. We were going toward the police station. I did not know I had cut the deceased at the time they took me to jail. This was the 20th day of December, 1932."

On cross-examination the defendant stated the deceased owed him $5 rent, due on the Malone house that he had been looking after:

"We had our argument over the house rent. He had some controversy with Dave Parker, who lived in one of the Malone houses, over the gas bill. I was standing

talking to J. S. Freeman, whom I had known for some time, when deceased came up. I do not remember what deceased said to start with, we went to quarreling and angry words were said. I don't know whether I called him a liar first or he called me a liar—I don't know whether I called him a g—— d—— s—— of — b——, or not; I was mad—about halfway angered because he was calling me a liar. He struck me first, I fell back and throwed my hand up, and held them up, and somebody separated us, and I never hit him any more. I hit him with the knife just at the last, after he knocked me down. The knife you hand me looks like my knife. I don't know where I struck him, I was so close. He hit me three times and I had my hand over my head. I hit him twice. I got the knife because he rushed me again and knocked my glasses and hat off and I thought he was going to beat me to death with the weight he had. I don't know who got my glasses the first time. I know Con Long, the assistant county attorney; he asked me a number of questions, and I said 'No' to pretty nearly everything he asked me. I don't know whether or not I told the county attorney I did not cut the deceased. I do not think I told Mr. Long I hit him with a knife."

Several pages are taken up with cross-examination of the defendant as to the statements he made to the assistant county attorney, Con Long. Con Long also testified as to what conversation was had with the defendant in the county attorney's office.

Tom Dodson, testifying on behalf of the defendant, stated:

"I live five miles east of Konawa. I have lived in Seminole county since 1905. I remember the incident of the fight between the deceased and the defendant, but do not remember the date; it occurred in front of the First State Bank in Seminole. Judge Nichols and I were standing near the bank. The first thing that drew my attention Mr. Morrison picked up Mr. Killingworth's glasses and handed them to him. Killingsworth knocked

him against a post. Up to that time I had not heard a word. As Morrison recovered his balance, he commenced hitting the defendant as fast as he could. I guess he hit him as many as ten licks. Morrison run back to the light pole that was near them and was throwing up his hands; he was doing it quick. The policeman ran in between them and separated them. I did not see any weapon in the hands of the defendant or Mr. Morrison; they did not have anything. I do not know what caused the fight."

Henry Wilkerson, Fred Plummer, George Black, and J. D. Gilliland in substance testified to the same facts as did Tom Dodson, and to the acquaintance of the respective parties engaged in the difficulty.

J. D. Mills, in rebuttal, stated:

"I saw the parties when they started to fight. I saw them strike at one another. The deceased struck at the defendant first with his fist. The officer came and separated them. I did not see anything in the hands of the deceased during the difficulty."

Kenneth Lewis, a rebuttal witness, stated:

"I saw the difficulty near where I was standing. I did not see the deceased knock the defendant down. I could see the deceased's hands; he did not have anything in his hands when he fell. I was about five feet from him."

The defendant has assigned several errors alleged to have been committed by the trial court, and urges that the same are sufficient to entitle him to a reversal. The first error presented is that the court erred in overruling the defendant's demurrer to the information. An examination of the information shows that it stated facts sufficient to advise the defendant of the charge he was required to meet in clear and concise language, and the court did not err in overruling his demurrer to the information.

The defendant's fourth, fifth, sixth, and seventh assignments of error will be considered together, as they

all relate to the question as to whether or not there was sufficient evidence under the law to sustain a conviction.

The defendant, in presenting his argument, insists that his demurrer to the state's evidence at the close of the state's case should have been sustained, for the reason that the state failed to establish the corpus delicti, and that the cause of the death was not proven.

An examination of the testimony contained in the record clearly shows that the deceased and the defendant met on the street in Seminole and there became engaged in a fight; they were separated by an officer; several by-standers testified that the defendant struck the deceased one or more times, and that they were separated by an officer; the officer started toward the jail with the parties, and, when they were near the barbershop across the street from where the fight took place, the deceased fell, and upon an examination it was shown that he had received a cut which resulted in his death. The testimony further shows that while they were going across the street the defendant dropped into the pocket of J. S. Freeman a bloody pocketknife. The defendant admits he cut the deceased with his knife, and the undertaker testified it was a fatal wound, that it went through the wall of the abdomen into the bowels.

The testimony upon the question of the corpus delicti is sufficient to show, not only the death of the deceased, but the means used by the defendant to bring about his death. No authorities are cited by the defendant to sustain his contention that the state failed to establish by competent proof the corpus delicti.

It is further urged by the defendant that the court erred in permitting Con Long to testify in rebuttal, over the objection of the defendant, and that the court erred

in permitting the introduction of the dying declaration, over the objection of the defendant. Long's testimony related to the dying declaration of the deceased, and the record discloses that the state laid the proper predicate to introduce the dying declaration, and the court did not err in admitting it.

No authorities are cited by the defendant to sustain his contention that it was error for the court to admit the testimony of Con Long and the dying declaration of the deceased.

It is next urged by the defendant that the court erred in permitting J. S. Freeman to testify, who at the time he was called to testify in the trial received his mail at Salinas, route 2, box 7-C, state of California, on the ground that the name of this witness had not been served upon the defendant, showing his post office to be in California, at any time before the jury was impaneled and sworn to try said case.

The record discloses that J. S. Freeman attended the preliminary and testified for the state. After the preliminary, the case was filed in the superior court of Seminole county, and then transferred to the district court of Seminole county, and on the 12th day of March, 1934, a list of witnesses that the state would use in the trial of the case, in which list was included the name of J. S. Freeman, was served on the defendant; after that time, and before the case was called for trial, the witness J. S. Freeman moved to the state of California.

This court has repeatedly held that, where a list of the witnesses was served on the defendant, and the defendant was convicted and a new trial granted, it was unnecessary for the state to again serve a list of the witnesses on defendant before the second trial. In other

words, this court holds that, after the list of witnesses is once served upon the defendant more than two days before the case is called for trial, if the case is not tried at the term of court to which it is assigned, it is not necessary when the case is called at a later term for the state to serve the list of witnesses once served on defendant —to serve him again with a list of the same witnesses. Patterson v. State, 53 Okla. Cr. 131, 12 Pac. (2d) 702; Yancey et al. v. State, 41 Okla. Cr. 197, 271 Pac. 170.

The name of J. S. Freeman as a witness for the state had been once served on defendant a sufficient length of time prior to the date the case went to trial, and it is not necessary to serve the name of the witness again, even though the witness may have changed his post office address in the meantime. The defendant had notice that J. S. Freeman would be a witness against him, by reason of the fact that, when a list of the witnesses was served upon him, on the 12th day of March, 1934, J. S. Freeman was named as one of the witnesses. The court did not err in permitting J. S. Freeman to testify.

The testimony conclusively shows that it was a fight between the defendant and the deceased voluntarily entered into by both parties, and that the defendant abandoned fighting with his fists and used his knife on the deceased, and inflicted a mortal wound, causing the death of the deceased. There is no reason or justification offered by the defendant sufficient to amount to self-defense, or that it was necessary for him to use the knife on the deceased in order to protect himself either from receiving great bodily harm or his life being taken. All of the testimony tends to show the defendant acted willfully in stabbing the deceased, and that he sought to cover it up by dropping the knife he had used on the deceased in the pocket of J. S. Freeman, who was his friend.

It is unfortunate that men become involved in difficulties and lose their temper and in haste take the life of their fellowman, and, when it is shown that the life was taken without any justification, it follows that the defendant must pay the penalty.

The jury took a very liberal view of the facts in this case, and returned its verdict of guilty of manslaughter in the first degree, fixing the punishment of the defendant at four years.

After a careful reading and study of the record, we fail to find any error in the record warranting a reversal. The defendant was accorded a fair and impartial trial. The court correctly advised the jury as to the law applicable to the facts. The evidence is sufficient to sustain the judgment. There being no errors in the record warranting a reversal, the judgment is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.