# FORREST ARMSTRONG v. STATE.

No. A-9587.   Nov. 9, 1939.
(95 P. 2d 919.)

John F. Pendleton, of Nowata, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DOYLE, P. J.    The information in this case, filed in the district court of Nowata county, charged that in said county on or about the 28th day of July, 1934, the defendant, Forrest Armstrong, did kill and murder P. R. Bowers with a certain deadly and dangerous weapon, to wit: A pocket knife with blade three inches long by inflicting certain mortal wounds, of which said mortal wounds so inflicted the said P. R. Bowers on the 31st day of July, 1934, did die.

Upon his trial the jury returned a verdict finding him guilty of manslaughter in the first degree and fixed his punishment at imprisonment in the state penitentiary for five years.

Motion for new trial was duly filed and overruled; May 31, 1938, the court pronounced judgment and sentence in accordance with the verdict.

The questions presented by this appeal and argued in the briefs are based on rulings of the trial court in the admission of evidence against the defendant's objections.

Upon the trial the defendant admitted the killing, and claimed he was justified in doing so in his own self-defense.

The evidence shows that there was a dance at the home of Bill Petty, a few miles northeast of Wann, on Saturday night, July 28, 1934, which was attended by at least 25 people of that neighborhood; that the defendant had a difficulty with Bill Edens in the east room of the house, in which no weapons were used; that the deceased took hold of the defendant while George Edens held his brother, Bill, and they separated them. The deceased then went out on the front porch of the house, and was followed by the defendant, and there the defendant stabbed the deceased, inflicting the fatal wound.

The widow of the deceased testified that with her husband she attended the dance at Bill Petty's home; that a difficulty arose between the defendant and Bill Edens in the east room; that her husband held Armstrong and said: "Forrest, don't fight any more; don't cause any more trouble, we are having such a good dance, don't have any more trouble." Then her husband went out on the porch; in just a few minutes she followed, and her husband was standing in the yard holding his side, and he

said, "I have been stabbed in the stomach; Forrest Armstrong did it." That her husband's brother, Otto and Mr. Cantrell put her husband in a car and they drove to the hospital in Bartlesville with him, where he remained until he died on the following Tuesday, at 8:45 p. m.

George Edens testified that he was at the dance and at Bill Petty's residence, saw some kind of altercation between his brother Bill Edens and Forrest Armstrong, in the southeast room, and they went together. P. R. Bowers had hold of Armstrong and he took hold of his brother; there were no licks struck; that after they were separated he went into the other room; that as he went off the porch he heard some one say, "P. R." is stabbed.

John Jackson testified that he went to Petty's place that night to see Mr. King, to get a mowing machine; that the first trouble started between Edens and Armstrong; that he did not know P. R. Bowers, who was trying to keep down the fighting; that he did not see anybody hit Armstrong with a chair. Later he saw Edens hit Armstrong with his fist, then somebody hit Edens, after he had hit Petty, and that was before Bill Edens was stabbed; that Forrest Petty and Bill Petty and Forrest Armstrong all three of them had knives; that he was in there about two minutes while the fight was going on and he left and went home.

V. E. Cantrell testified that he lives at Wann, attended the dance that night at the Petty place and was present when the trouble started between Forrest Armstrong and Bill Edens. P. R. Bowers and George Edens separated them. P. R. said, "Let's don't have any trouble, let's don't break up the dance, we are all having a good time, let's don't break up the dance." That shortly after that he saw P. R. Bowers out on the south porch, then Bill Petty started out and somebody knocked him down

with a chair, then Forrest Armstrong went out, then he went out with his wife. P. R. and Wood Bowers were standing out there, Wood said somebody stabbed P. R. and he asked P. R. who did it, and he said Forrest Armstrong. That they put P. R. in his car and took him to the doctor.

The testimony of several other witnesses for the state was substantially the same as that of those above quoted; they each testified that the deceased did not hit the defendant or strike him with a chair.

Hugh Owen testified that he is now sheriff; that on July 28, 1934, he was a deputy sheriff. He produced the knife that was taken from the defendant; it was admitted in evidence without objection; that the day following the dance he arrested the defendant and brought him to Nowata; that if the defendant had any bruises or injuries he did not notice them.

He further testified that the next day the defendant said he was so drunk that he didn't remember a thing that happened.

On the part of the defense, J. S. Holland testified that he was present at the Petty home that night, that he was on the outside and saw P. R. Bowers knock Armstrong down on the front porch with a chair, and Armstrong went down on his hands and knees, then he walked off.

Viola King testified that she arrived at the dance about 11 o'clock and shortly afterwards saw P. R. Bowers pick up a chair in the room and he raised it up and started through the crowd with it; that it was a little old white looking cowhide bottom chair.

J. H. King testified that he was standing by his wife near the south door and saw P. R. Bowers pick up a chair and he backed out with his wife.

On cross-examination he stated that it was about 15 minutes after 11 when he arrived at the dance; that when he stepped out Bill Edens came out and told him that he had been cut; that he never saw anything further that happened there that night.

Ernest Petty testified that his age was 22 years; that he was at home that night and saw P. R. Bowers hit Forrest Armstrong with a chair; he hit him twice, and he identified the chair which was offered in evidence.

Forrest Petty testified that he was at home that night and saw P. R. Bowers hit Forrest Armstrong with a chair; that Forrest Armstrong was not drunk; that his father was feeling pretty good and witness himself was drunk.

The defendant, as a witness in his own behalf, testified substantially as follows: That his age is 27 years, had lived in the Wann neighborhood all his life. Was at the dance at Bill Petty's house; that when the fight started he was about the middle of the east room and P. R. Bowers hit him with a little chair that had a cow-hide bottom; that he did not give him any reason to strike him, and there were 20 or 25 persons in the room at the time; that after he was struck a couple of times that he went out the door and Bowers hit him on the back of the head with the same chair, and knocked him down on his hands and knees and he got his knife out of his pocket and stabbed him to keep him off, then he went back in the house; that he thought it was necessary to do it to protect himself and he did not have his knife out in the house. That after his arrest he did not tell Hugh Owen that he was drunk, but did tell him that he had been drinking, then said to him, "Hugh, I haven't talked to my attorney yet, and I am not talking."

The errors assigned and argued will be considered in the order presented in the defendant's brief.

The first assignment is that the court erred in permitting the testimony of Dr. C. W. Crawford, deceased, who had testified at the preliminary examination, to be read in evidence, for the reason that due and proper notice thereof, as required by the Constitution, was not given to the defendant.

The record shows that the name of the deceased witness was indorsed upon the information, and that six days before the trial notice was served upon the defendant, the state would offer in evidence the testimony of said deceased, taken at the preliminary hearing.

Thus it appears there was a full compliance with section 20 of the Bill of Rights. Const. art. 2, sec. 20, Okla. St. Ann.

The second assignment is that the court erred in permitting the introduction of the evidence of Dr. G. W. Crawford, deceased, for the reason that the witness, Mrs. Alberta Ozbun, court reporter, had been away from the state for sometime and did not know whether the transcript of the testimony was in its original condition, and the contention is made that said transcript had not been filed in the court clerk's office, as required by the Code of Criminal Procedure. Sec. 2800, 22 Okla. St. Ann. § 258.

She testified that she was court reporter and took the testimony at the preliminary hearing and delivered the transcript of the testimony to the court clerk; that she had read the transcript and had also read her notes and this was the transcript which she had made, and that it looked to be in the same condition as when she deposited it in the court clerk's office.

In the case of Exleton v. State, 30 Okla. Cr. 224, 235 P. 627, 628, this court said:

"The transcript of the evidence offered had not been filed with the clerk of the district court as provided by section 2491, Compiled Statutes 1921, supra [section 2800, St. 1931, 22 Okla. St. Ann. § 258]. But this court in the case of Baldock v. State, 16 Okla. Cr. 203, 182 P. 265, has held that such filing is not essential. It is apparent that section 2491, supra [section 2800, St. 1931, 22 Okla. St. Ann. § 258], insofar as it relates to the filing of this transcript with the clerk of the court, is a directory and not a mandatory statute, its purpose being to provide a depository so that the question of the authenticity and identity of the transcript may not be drawn in question."

In the recent case of Willard v. State, 66 Okla. Cr. 344, 92 P. 2d 600, this court held:

"A paper or document is 'filed,' so far as rights of parties are concerned, when it is delivered to and received by proper officer with whom it is filed."

In the opinion it is said:

"A paper is said to be filed when it is delivered to the proper officer, and by him received to be kept on file. 1 Littleton 113; 1 Hawk. Pl. Cr. 7, 207.

"Since the word file means to deposit in a court or public office a paper or document, filing consists of delivery of the same to the proper officer for the purpose of being kept on file by him in a proper place.

"In the sense of a statute requiring the filing of a paper or document, it is filed when delivered to and received by the proper officer to be kept on file. The word carries with it the idea of permanent preservation of the thing so delivered and received; that it may become a part of the public record. It is not synonymous with deposit. People v. Peck, 67 Hun 560, 22 N. Y. S. 576."

In the case of Bauer v. Samples, 181 Okla. 161, 72 P. 2d 813, the Supreme Court held:

"A pleading is filed within the contemplation of the law when it is delivered to the proper officer with the

·intention that it shall ·be kept by him and became a part of the filings in the case."

It follows from the foregoing that the court did not err in admitting the transcript of the evidence of Dr. G. W. Crawford.

The third assignment is that the court erred in admitting the dying declaration of P. R. Bowers, as shown by the testimony of Dr. G. W. Crawford, for. the reason that the same was not made under the sense of impending death.

The testimony objected to was substantially as follows:

"I first saw the deceased July 28th, about midnight in front of my office at Dewey, I instructed those with him to take him to the hospital at Bartlesville immediately; I arrived there within 20 minutes. We took him to the major operating room and examined him, he had a stab wound one or one and a half inches long, about two inches to the left and two inches above the navel, it extended into the abdominal cavity, getting larger as it got deeper. It extended into the stomach and punctured the large intestines. I was with him almost continuously until he died. He told me about how he received this wound; his physical condition was extremely critical; he was clear of mind; this statement I was just relating was made after he was informed of the seriousness of his condition; that lead him to state shortly afterwards that he would have to give up."

Cross-examination by Mr. Pendleton:

"Q. Did he, at any time prior to the time he made the statement that he was going to give up, realize he was serious and might die? A. Yes, sir. Q. Did he have hopes of recovery until he made that statement? A. Yes, sir, I think so. Mr. Pendleton: Then we object to any time prior to that? It is admissible after the time he made the statement. And we now ask that the jury be

instructed not to consider any such statement. The Court: The jury will not consider any statement the deceased made prior to the time he had given up hope of recovery, because a statement made under the sense of impending death after he realizes that death is close at hand, any statement that he makes then is competent, and you may consider any statement the deceased may have made to the doctor after he realized impending death. By Sams: (Continuing the reading of said transcript.) Q. He never had a chance after he was cut? A. Very slight. Q. He did not realize that he had no chance right at first? A. He had not given up hope. Q. When was this statement made? A. On Tuesday. After this statement was made to him as to his condition, he made the statement he would have to give up. Mr. Pendleton: The defendant moves to strike all of the testimony of the doctor with reference to any dying declaration. The statement is not a dying declaration, made under the sense of impending death, and it is incompetent, irrelevant and immaterial. The Court: Overruled."

Redirect examination:

"Q. Did he tell you he knew he was going to die? A. Yes, sir. Q. Did he tell you on Tuesday? A. Yes, sir. Q. Was that on the day he told you he was going to give up? A. Yes, sir, after he told us who cut him. Q. Who did he say cut him? A. The same person—Frosty Armstrong. Q. What time that day did he die? A. 8:45."

On cross-examination witness stated:

"The statement was made after he had been informed of his condition—that his condition was extremely perilous. The patient said that the injury was inflicted by a person known to him as Frosty Armstrong, that there had been no previous trouble between them, that the alleged assailant, without provocation, ran up in front of him and with an oath and threat, stabbed him. From my recollection, he gave this sequence of events that occurred. By some difficulties that developed, he saw that it was no place for him, and he decided to find his wife and go home. That he went out of the house on the front porch

and while there searching for his wife, the man he named as Frosty Armstrong, raised up and said something about 'I have you now' and stabbed him.   Mr. Pendleton: Now comes the defendant and moves to strike all of the testimony in regard to the dying statement, for the reason the same does not come within the rule making it a dying declaration.   The Court: Overruled under the admissions expressed to the jury in regard to this testimony."

Our Constitution guarantees that:

"In all criminal prosecutions the accused shall have the right * * * and be confronted with the witnesses against him."   Bill of Rights, Const. art. 2, sec. 20, Okla. St. Ann.

This right has always been deemed one of the most sacred and valuable safeguards of the citizen.   It protects the accused against the peril of conviction by means of ex parte testimony or affidavits given in his absence, or when he had not the right of cross-examination, with the exception that in homicide cases dying declarations made by the victims are held admissible as evidence, because they were admissible at common law, and as a matter of compelling necessity to prevent a failure of justice. Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532.

The rule is universal that before dying declarations can be admitted in evidence it must appear that they were made under a sense of impending death, but it is not necessary that the person making them state at the time that they are so made, as that fact may be proved, not only by what the declarant said, but by the condition, by the nature and extent of his wounds, or from his conduct or other circumstances of the case.   Poling v. State, 12 Okla. Cr. 27, 151 P. 895, Ann. Cas. 1918E, 663; Morehead v. State, 12 Okla. Cr. 62, 151 P. 1183, Ann. Cas. 1918C, 416; Stealer v. State, 10 Okla. Cr. 460, 138 P. 395; Addington v. State, 8 Okla. Cr. 703, 130 P. 311; Morris v. State, 6 Okla. Cr. 29, 115 P. 1030.

In Stealer v. State, supra, this court held:

"The constitutional provision that 'In all criminal prosecutions the accused shall have the right to be confronted with the witnesses against him' (Bill of Rights, § 20) is not infringed by permitting the testimony given on the preliminary examination of the defendant by a witness who has since died to be read against him upon the trial of the case."

The foregoing authorities abundantly show that the objections interposed to the declarations were untenable, and that the court committed no error in admitting in evidence the declarations of the deceased.

Finally it is contended that the verdict is not sustained by the evidence.

A consideration of the evidence impresses the writer with the thought that the defendant might well have been convicted of murder. We have seldom read a record in a homicide case where there were less palliating circumstances in behalf of the defendant, than this case presents.

As we view the record, the jury in charity for the weakness of humankind, lessened the crime to manslaughter in the first degree and was exceedingly merciful in assessing the punishment.

A careful examination of the whole case leads to the conclusion that no error has been committed to the defendant's prejudice. The judgment of the trial court is therefore affirmed.

BAREFOOT and DAVENPORT, JJ., concur.